FILED
COURT OF APPEALS
DIVISION II

2015 JUL 28 AM 8: 23

STATE OF WASHINGTON

BY_____
            DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| PUGET SOUNDKEEPER ALLIANCE; RE SOURCES FOR SUSTAINABLE COMMUNITIES; and FRIENDS OF THE EARTH, | No. 45609-5-II |
| Appellants, | PUBLISHED OPINION |
| v. | |
| STATE OF WASHINGTON, POLLUTION CONTROL HEARINGS BOARD; and DEPARTMENT OF ECOLOGY, | |
| Respondents. | |

BJORGEN, A.C.J. — Puget Soundkeeper Alliance, RE Sources for Sustainable

Communities, and Friends of the Earth (collectively Soundkeeper) challenge an order of the

Pollution Control Hearings Board (Board) involving a wastewater discharge permit that the

Department of Ecology (Department) issued to BP West Coast Products LLC (BP) for one of its

oil refineries. The Board ruled that the Department properly included a condition specifying that

a single failed whole effluent toxicity (WET) test does not violate the permit's terms as long as

BP takes certain subsequent measures. On appeal, Soundkeeper argues that the permit condition

effectively allows toxic discharges prohibited by statute and the Department's own regulations.

Because the Department's interpretation of the WET rules allows discharges that violate a water quality standard, and thus conflicts with the governing statute and regulations, we reverse.

## FACTS AND PROCEDURAL HISTORY

In February 2012, the Department issued a National Pollutant Discharge Elimination System (NPDES) permit under the Federal Water Pollution Control Act (clean water act) (CWA), 86 Stat. 816, *codified as amended at* 33 U.S.C. §§ 1251-1388, and the state water pollution control act, chapter 90.48 RCW, authorizing BP to discharge treated wastewater from the BP Cherry Point Refinery into the Strait of Georgia, a navigable waterway.[1] Soundkeeper and BP both appealed to the Board, challenging several of the permit's conditions.

Of the permit conditions addressed by the Board, the one at issue in this appeal is designated in the permit as "S7. Acute Toxicity" (S7). Administrative Record (AR) at 684. It provides that "[t]he effluent limit for acute toxicity is: [n]o acute toxicity detected in a test concentration representing the acute critical effluent concentration (ACEC)." AR at 684. Subsection A of condition S7 defines the ACEC as "the maximum concentration of effluent during critical conditions at the boundary of the acute mixing zone," namely, "3.6 [percent] effluent." AR at 684.

Subsection B of condition S7 explains what constitutes compliance with the acute toxicity effluent limit:

> Compliance with the effluent limit for acute toxicity means the results of the testing specified in subsection C. show no statistically significant difference in survival [of the test organisms] between the control and the ACEC.

---

[1] The point of discharge, which the permit identifies as "Outfall 001," lies in an area designated as an extraordinary marine receiving water, part of the Department of Natural Resources's Cherry Point Aquatic Reserve. AR at 544-45, 672. According to the Department, each day BP's facility discharges an average of seven million gallons of treated wastewater used in its refining processes.

If the test results show a statistically significant difference in survival between the control and the ACEC, the test does not comply with the effluent limit for acute toxicity. [BP] must then immediately conduct the additional testing described in subsection D. [BP] will comply with the requirements of this section by meeting the requirements of subsection D.

AR at 684. The subsection goes on to specify how to determine whether differences in test results are statistically significant, depending on the magnitude of the difference. Subsection C identifies the WET testing methods BP must employ, including how frequently to test and which organisms to use.

Subsection D of condition S7 gives BP two options upon learning of a failed test result. BP may continue discharging wastewater for the duration of the permit, without becoming subject to enforcement action by the Department, so long as it pursues either option.

The first option requires BP to conduct additional WET tests weekly for four consecutive weeks. If all four subsequent samples pass the test, BP "must submit a report . . . on possible causes and preventive measures for the transient toxicity event." AR at 686. If any of the four subsequent samples also fails the WET test, however, BP "must submit a Toxicity Identification/Reduction Evaluation plan to [the Department] within 60 days after the sample date." AR at 686.

The second option applies if BP "believes that the [failed] test result is anomalous," in which case it may conduct one additional WET test and notify the Department, explaining why it believes the original result unreliable or erroneous. AR at 685-86. If the second sample also fails the test, or if the Department disagrees that the original result was anomalous, BP must comply with the requirements just described under the first option. If the Department agrees that the first result was an anomaly, and the second sample passes the test, the Department will rely on the second test and BP need take no further action.

Soundkeeper challenged condition S7 before the Board, arguing that it allowed BP "to discharge toxic effluent in violation of applicable law," and "[i]nstead of providing that failure of a WET test is a permit violation, [it] allow[s] for compliance through performance of retesting and planning that need not actually reduce toxicity."[2] AR at 32-33. BP challenged the same condition before the Board on the ground that it "unlawfully suggests that a permittee may violate" the permit condition by failing a WET test, even when the permittee complies with the follow-up process. AR at 101. The Department likewise took the position that "there is no permit violation when the WET standard of the Permit is violated, as long as the permittee performs the required follow-up testing, monitoring, and study required by the Permit." CP 12. The Board consolidated the appeals.

Soundkeeper, the Department, and BP each moved for summary judgment on the legal issues related to condition S7. The Board granted the Department's and Soundkeeper's motions in part and denied BP's, ruling the permit term valid to the extent it provided that a single failed WET test did not violate the permit, but remanding to the Department "to clarify that ongoing exceedances of the WET limit are violations of the Permit and are enforceable." AR at 1108-10.

Soundkeeper petitioned for judicial review in the Thurston County Superior Court under the Administrative Procedures Act, chapter 34.05 RCW. The Board subsequently issued a certificate of appealability under RCW 34.05.518(3)(b), and the parties petitioned us for direct review of the Board's order with respect to condition S7. Our commissioner granted the petition, accepting "review of the [Board]'s order on summary judgment regarding whether a single WET test failure is a violation of the NPDES permit." Ruling Accepting Direct Review, *Puget*

---

[2] According to the Department's "fact sheet," BP's refinery failed 17 of the last 55 reported WET tests. AR at 568.

No. 45609-5-II

*Soundkeeper v. Pollution Control Hr'gs Bd.*, No. 45609-5-II, at 5 (Wash. Ct. App. Feb. 27, 2014).

## ANALYSIS

After setting out the standard of review, we examine the relevant law governing NPDES permits for wastewater discharges. We then consider whether the Board's interpretation of the permit condition at issue here comports with those provisions. Concluding it does not, we reverse the Board.

### I. STANDARD OF REVIEW

The Administrative Procedures Act governs our review of the Board's orders. RCW 34.05.510, .518; *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 587, 90 P.3d 659 (2004). As relevant, the Administrative Procedures Act specifies that the reviewing court

> shall grant relief from an agency order in an adjudicative proceeding only if it determines that:
> . . .
> (b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;
> . . .
> (d) The agency has erroneously interpreted or applied the law;
> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court; [or]
> . . .
> (h) The order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency.

RCW 34.05.570(3). The party challenging an administrative order bears the burden of demonstrating its invalidity. RCW 34.05.570(1)(a).

Where, as here, the original administrative decision was on summary judgment, "the reviewing court must overlay the [Administrative Procedures Act] standard of review with the summary judgment standard." *Verizon Nw., Inc. v. Emp't Sec. Dep't*, 164 Wn.2d 909, 916, 194

5

P.3d 255 (2008). Our review is limited to the record before the Board. RCW 34.05.558; *Port of Seattle*, 151 Wn.2d at 587. "Summary judgment is appropriate only where the undisputed facts entitle the moving party to judgment as a matter of law." *Verizon Nw.*, 164 Wn.2d at 916. In reviewing summary judgment, we evaluate the facts in the administrative record de novo. *Verizon Nw.*, 164 Wn.2d at 916.

We review an agency's legal determinations under the "error of law" standard, which allows us to substitute our view of the law for the agency's. *Verizon Nw.*, 164 Wn. 2d at 915. Under this standard, we generally review the agency's application of the law to a particular set of facts de novo. *Port of Seattle*, 151 Wn.2d at 588. Where a challenge requires us to construe a statute, we "determine[] the meaning and purpose of a statute de novo," but accord "great weight" to the agency's interpretation of "an ambiguous statute which falls within the agency's expertise," provided that interpretation does not conflict with the statute's language or underlying intent. *Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology*, 146 Wn.2d 778, 790, 51 P.3d 744 (2002).

We show the same deference to an agency's interpretation of its own regulations. *Port of Seattle*, 151 Wn.2d at 593. Nonetheless, the agency's interpretation does not bind us, and "deference to an agency is inappropriate where the agency's interpretation conflicts with a statutory mandate." *Dep't of Labor & Indus. v. Granger*, 159 Wn.2d 752, 764, 153 P.3d 839 (2007). To interpret agency regulations, we apply the same principles used to interpret statutes. *Linville v. State*, 137 Wn. App. 201, 209, 151 P.3d 1073 (2007).

In interpreting a statute, our "fundamental objective is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then [we] must give effect to that plain meaning as an expression of legislative intent." *Dep't of Ecology v. Campbell &*

*Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). We derive the plain meaning "from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Campbell & Gwinn*, 146 Wn.2d at 11.

If "the statute remains susceptible to more than one reasonable meaning" after consideration of all relevant statutory language, "the statute is ambiguous and it is appropriate to resort to aids to construction, including legislative history." *Campbell & Gwinn*, 146 Wn.2d at 12. We also "consider interpretation of analogous federal law" in these determinations. *Marquis v. City of Spokane*, 130 Wn.2d 97, 113, 922 P.2d 43 (1996).

## II. GOVERNING LAW

The federal CWA aims to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and to achieve or maintain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. § 1251(a); *Pub. Util. Dist. No. 1 of Jefferson County v. Dep't of Ecology*, 511 U.S. 700, 704, 114 S. Ct. 1900, 128 L. Ed. 2d 716 (1994). The CWA specifies that "it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited," 33 U.S.C. § 1251(a)(3), and broadly prohibits "the discharge of any pollutant by any person," except as authorized by enumerated statutory provisions. 33 U.S.C. § 1311(a).

The federal Environmental Protection Agency (EPA) or EPA-authorized state agencies may issue NPDES permits allowing wastewater discharges that meet the CWA's requirements. 33 U.S.C. § 1342. Our Legislature has granted the Department authority "to participate fully in the programs of the [CWA] as well as to take all action necessary to secure to the state benefits and to meet the requirements of that act." RCW 90.48.260(1). The EPA has duly authorized the

7

Department to issue NPDES permits. *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1009-10 (9th Cir. 2002).

Agencies issuing NPDES permits must impose limits on discharges as necessary to implement water quality standards set by state or federal statutes and regulations, regardless of technical practicability. 40 C.F.R. § 122.4; WAC 173-220-130(1)(b); *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1163, *amended on denial of reh'g*, 197 F.3d 1035 (9th Cir. 1999). More specifically, state agencies may not issue NPDES permits

> [w]hen the conditions of the permit do not provide for compliance with the applicable requirements of CWA, or regulations promulgated under CWA; . . . [or w]hen the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States.

40 C.F.R. § 122.4(a), (d). Washington law makes clear that these requirements apply to each discharge: WAC 173-220-150(1)(c) provides that "each issued [NPDES] permit shall require that . . . [a]ny discharge of any pollutant . . . at a level in excess of that identified and authorized by the permit shall constitute a violation of the terms and conditions of the permit."

Similarly, our Legislature has in no uncertain terms prohibited the Department from issuing permits that allow toxic discharges in violation of applicable standards: "In no event shall the discharge of toxicants be allowed that would violate any water quality standard, including toxicant standards, sediment criteria, and dilution zone criteria." RCW 90.48.520. Consistently with this mandate, WAC 173-205-070(1)(d) further specifies that "[t]he compliance test for acute toxicity shall be considered to be a maximum daily discharge permit limitation."

Turning now to the standards, the narrative water quality standard governing toxic discharges is set out in WAC 173-201A-240(1):

> Toxic substances shall not be introduced above natural background levels in waters of the state which have the potential either singularly or cumulatively to adversely affect characteristic water uses, cause acute or chronic toxicity to the most sensitive

8

biota dependent upon those waters, or adversely affect public health, as determined by the department.

This regulation mandates also that the Department "shall employ or require chemical testing, acute and chronic toxicity testing, and biological assessments, as appropriate, to evaluate compliance with" the standard. WAC 173-201A-240(2).

Compliance with the narrative standard is more precisely fixed by WAC 173-205-070(1), which provides that

[a] discharge is in compliance with the narrative water quality standard for acute toxicity when the most recent acute toxicity test has shown no statistically significant difference in response between the acute critical effluent concentration and a control.

As discussed, condition S7 employs the WET test to measure acute toxicity. The United States EPA Environmental Appeals Board described that test and its role in the NPDES permit system in the following terms:

Whole effluent toxicity ("WET") is defined under EPA regulations as "the aggregate toxic effect of an effluent measured directly by a toxicity test." 40 C.F.R. § 122.2 (2000). . . . Basically, the WET approach protects the quality of the receiving water body from the aggregate toxic effects of a mixture of pollutants in the effluent. *Id.* The WET approach is implemented by measuring the degree of response of aquatic test organisms that have been exposed to toxic pollutants over short and long periods of time. These two types of WET tests are known respectively as acute and chronic toxicity testing. *See id.* at 95.

*In re New England Plating Co.*, 9 E.A.D. 726, 2001 WL 328213, *1 n.2 (EPA 2001).

The United States Court of Appeals for the District of Columbia Circuit described the WET test more specifically in *Edison Electric Institute v. Environmental Protection Agency*, 391 F.3d 1267, 1272-73 (D.C. Cir. 2004) (citing EPA final WET rule, 67 Fed. Reg. at 69,957-58):

A single WET test involves exposing multiple batches of organisms to the effluent at various concentrations, as well as to a "control" sample of pure water, and then aggregating the effects on each batch. Statistical analysis then is used to ensure that any observed differences between the organisms exposed to a given effluent

9

concentration and those exposed to the control blanks most likely are not attributable to randomness—that they are statistically significant.

The circuit court affirmed EPA's determination that "these WET test methods exhibit a degree of precision compatible with numerous chemical-specific tests already in use." *Edison Elec. Inst.,* 391 F.3d at 1271.

The consequences of a failed acute WET test are also set out in the Department's rules. According to WAC 173-205-070(1)(c),

> [i]f a statistically significant difference in response is determined between the control and the acute critical effluent concentration in an acute toxicity test, then the effluent has failed the test for compliance with the whole effluent acute toxicity limit and the permittee shall immediately begin the process described in WAC 173-205-090.

WAC 173-205-090 requires the permittee to either conduct four weekly WET tests or conduct one additional test and notify the Department that it believes the failed result anomalous. WAC 173-205-070(5)(c) provides that the Department may identify "anomalous test results which should not be used for the compliance determinations in this chapter."

In the event of a single failed WET test not determined by the Department to be anomalous, WAC 173-205-100(1)(b) requires the permittee to "[s]ubmit a report to the department on the possible causes and preventive measures for the transient toxicity within thirty days of the last additional sample." If any of the additional samples fail the WET test, however, "the permittee shall submit a plan to the department within sixty days of the last additional sample for a toxicity identification/reduction evaluation." WAC 173-205-100(2).[3]

---

[3] As part of this plan, the permittee may request a six-month delay before even beginning the investigation aimed at controlling the most likely sources of toxicity. WAC 173-205-100(2)(a). The legality of such a lengthy cumulative delay in remedying a toxic discharge shown by two failed, nonanomalous WET tests is not before us.

### III. THE BOARD'S INTERPRETATION OF CONDITION S7

Soundkeeper contends, for two closely related reasons, that the Board erred in ruling that the Department may issue NPDES permits that specify that a single failed WET test does not violate the permit's terms. First, Soundkeeper argues that the governing statute and regulations clearly establish that a single WET test failure constitutes a violation of the water quality standard, and thus of the permit, and that the Board therefore based its ruling on an erroneous interpretation of law. Second, Soundkeeper argues that the Board erred in deferring to the Department's interpretation of the statute and regulations because (1) the record fails to support a determination that a single WET test failure does not establish a violation of the water quality standard and (2) the Department's interpretation conflicts with its own regulations and the governing statute.

The Department counters that the WET test is inherently imprecise because it relies on living organisms and that a failed WET test therefore "does not prove that a facility discharged a toxic substance." Br. of Resp't Ecology 16-18, 19. From this, the Department argues that condition S7 does not run afoul of the requirements of the CWA and state water quality standards. Because the matter concerns a technical, scientific question within the Department's expertise, it argues that the Board did not err in deferring to the Department's decision not to treat a single failed WET test as a permit violation.

BP echoes the Department's arguments,[4] pointing out that the statistical methods create some risk of "false positive" WET test results, resulting in a probability over the five-year permit

---

[4] BP also argues that compliance with WAC 173-205-090's retesting and evaluation process itself constitutes compliance with the narrative water quality standard, and thus with the permit, regardless of how many samples fail the WET test. We granted review, however, only on the issue of whether a single failed WET test constitutes a permit violation. Ruling Accepting Direct Review, *Puget Soundkeeper v. Pollution Control Hr'gs Bd.*, No. 45609-5-II at 5 (Feb. 27, 2014). Our resolution of that issue, furthermore, renders BP's argument on this point untenable.

duration of at least one such false positive that BP deems "unacceptably high." Br. of Resp't BP at 29-31, 31 n.2. BP further argues that, because the regulation prescribes specific actions a permittee must take in the event of a failed WET test, the use of the terms "whole effluent toxicity limit" and "maximum daily discharge permit limitation" in WAC 173-205-070 does not necessarily establish that exceeding those limits violates the permit. Br. of Resp't BP at 31-36. BP also points out that the fact that a discharge that passed the WET test is in compliance with the narrative standard does not logically imply that a discharge that failed the most recent WET test is out of compliance with the standard.

We agree with Soundkeeper. The Board's order authorizes the Department to issue permits that allow discharges that fail a valid WET test. As shown below, the regulations' plain language dictates that a single failed WET test violates the narrative water quality standard, unless the Department designates the result anomalous under WAC 173-205-070(5)(c). The governing statutory and federal regulatory provisions make clear that NPDES permits may not authorize discharges that violate a water quality standard. Therefore, the Department's interpretation, to which the Board deferred, conflicts both with the regulations' plain language and with the controlling statute and federal regulations.

A. The Board's Order Conflicts with Regulations Establishing That a Failed WET Test Violates Water Quality Standards

The water quality standard at issue provides that "[t]oxic substances shall not be introduced above natural background levels in waters of the state which have the potential either singularly or cumulatively to . . . cause acute or chronic toxicity . . . as determined by the department." WAC 173-201A-240(1). The regulation mandates "acute and chronic toxicity testing . . . to evaluate compliance" with that standard. WAC 173-201A-240(2). A related regulation defines "compliance with the narrative water quality standard for acute toxicity" and

12

expressly states that a failed WET test means that "the effluent has failed the test for compliance with the whole effluent acute toxicity limit." WAC 173-205-070(1)(c). Contrary to the Department's and BP's position, then, the regulations clearly establish not only that a passing WET test demonstrates compliance with the standard, but that failing the test establishes a violation of the standard.

Consistently with the controlling federal regulation, 40 C.F.R. section 122.4, the Department's acute toxicity WET regulation, WAC 173-205-070(1)(d), unambiguously requires that "[t]he compliance test for acute toxicity shall be considered to be a maximum daily discharge permit limitation." WAC 173-220-150(1)(c) further mandates that "each issued [NPDES] permit shall require that . . . *[a]ny discharge* of any pollutant . . . at a level in excess of that identified and authorized by the permit shall constitute a violation of the terms and conditions of the permit." (Emphasis added.) These regulations also leave no room but to conclude that a failed WET test establishes a violation of a water quality standard.

BP seeks to escape this conclusion by arguing that failure to comply with an acute toxicity limit or maximum daily discharge limitation does not equate with failure to comply with a water quality standard. BP points out that, unlike the regulations defining compliance with the Department's numeric water quality standards applying to specific substances, the regulation at issue here prescribes additional testing and remedial measures in the event of a failed test. BP contends that this shows that the regulations do not treat a failed WET test as a violation of the water quality standard.[5] We disagree.

---

[5] BP also argues that reading the regulations so that a failed WET test establishes a permit violation would render the follow-up testing and evaluation provisions superfluous. This is so, BP contends, because finding a permit violation would authorize the Department to order further testing and evaluation in any event. This argument is not persuasive. Including in the regulation specific procedures to follow in case of a violation creates certainty and relieves regulators from

The prescription of steps that a permittee must take upon failing the compliance test in no way indicates that following those steps means no violation occurred. As just shown, this reading runs counter to the plain import of the regulations' language. Further, it is eminently logical, after defining what constitutes a violation, to articulate steps designed to return the permittee to compliance and prevent future violations.

Also, the regulations' treatment of compliance tests for numeric water quality standards does not imply that a single failed WET test is not a permit violation. The tests for compliance with numeric water quality standards necessarily show which substances exist at toxic levels. WET testing, on the other hand, detects toxicity in the entire mixture of substances a discharge contains, but does not reveal exactly which substance or combination of substances produced that toxicity. *See* AR at 444 ("WET testing is necessary because EPA cannot develop water quality criteria for every one of the thousands of toxic pollutants possibly found in wastewater discharges. WET testing is also the only method available to permit managers for assessing the toxic interaction of pollutants.").

The follow-up evaluation procedures for WET tests plainly aim to provide regulators and permittees with additional information so that they may determine the cause of the toxicity and restore compliance with the WET limit. In the case of tests for a specific substance, these questions generally do not arise: the permittee necessarily knows the problem substance and likely has some idea how it entered the discharge in toxic amounts. Thus, the regulations'

---

having to draft an order every time a sample fails the WET test. The record shows that the Department included the follow-up procedures in the regulation for precisely these reasons. *See* AR at 515-16 (The language was intended to meet a perceived "need for a very defined process" and because the Department's "facility mangers didn't want to have to interrupt their workload to write an order . . . to implement a TI/RE, for example.").

14

differing treatment of WET tests merely reflects the role and nature of WET testing, not any uncertainty about whether a discharge was in fact toxic.

One of respondents' most powerful arguments is that due to the inherent imprecision of the WET test, a single failed test does not reliably show the discharge of a toxic substance. When asked at oral argument whether anything in the record showed it had made such a determination, the Department directed our attention only to the WET regulations themselves and the Department's NPDES permit writer's manual. Wash. Court of Appeals oral argument, *Puget Soundkeeper v. Dep't of Ecology*, No. 45609-5-II (March 31, 2015), at 26 min. 53 sec. through 28 min. 31 sec. (on file with court).

The regulations, however, confirm that a valid, failed WET test shows that the discharge was toxic. The WET testing regulations define "[s]tatistically significant" as "establishing that a difference in response between a control and an effluent concentration is likely due to toxicity and not variability." WAC 173-205-020. WAC 173-205-100 provides that, in the event of a failed WET test, if all four samples pass the follow-up WET tests mandated by WAC 173-205-090, "the toxicity can be considered as transient." This language plainly contemplates that a single, statistically significant failed WET test not deemed anomalous shows that a toxic discharge occurred. In fact, the Department concedes in its brief that "[t]ransient toxicity is not anomalous or a 'fluke' result" and that "[i]f the test was valid through the statistical review, toxicity may be present in the sample." Br. of Resp't Ecology at 7.

In his deposition testimony, Randall Marshall, the Department's WET coordinator and author of both the WET regulations at issue here and the Department's NPDES permit writer's manual, confirmed that a statistically significant, failed WET test indicates that a toxic discharge occurred:

15

> If we don't find [toxicity in the follow-up testing], we do not conclude that the toxicity was nonexistent in that first sample. If it was a good test and it passed everything, it most likely was a definite toxicity hit.

AR at 868. Although not a regulation, the permit writer's manual confirms this view. The manual describes one of the purposes of WET testing as "[t]o assess and limit WET to levels allowable under the state Water Quality Standards." AR at 445. It flatly states that "[i]f there is a statistically significant difference in response between the ACEC . . . and the control, then toxicity has been demonstrated." AR at 451.

Thus, the Department effectively concedes, and its own regulations establish, that a failed WET test demonstrates that a toxic discharge occurred. The applicable water quality standard, WAC 173-201A-240(1), bluntly states that "[t]oxic substances shall not be introduced above natural background levels in waters of the state which have the potential either singularly or cumulatively to . . . cause acute or chronic toxicity . . . as determined by the department." Issuing a permit that allows BP to fail a WET test without violating the permit would allow the introduction of toxic substances with the potential to cause acute toxicity in contradiction of this standard. WAC 173-201A-240.[6] Thus, the challenged permit condition allows discharges prohibited by law.

The Board, as noted, deferred to the Department's "determination that a single WET limit exceedance does not indicate a pattern of toxicity, but is instead the trigger for a further process

---

[6] We note that federal regulators treat the failure of a required WET test as a violation of NPDES permits. *See, e.g., City of Broken Bow, Nebraska*, CWA-07-2009-0077, 2009 WL 2943887, at *6-7, EPA July 2, 2009; *City of Yankton, South Dakota*, NPDES-SD-0023396, 1993 WL 33325, at *9, EPA ALJ Jan. 21, 1993). The *Edison Electric* court also contemplated that a single failed WET test would constitute a permit violation and potentially subject the permittee to enforcement action. 391 F.3d at 1271.

aimed at determining if, in fact, there is a violation of the toxicity standard." AR at 1108. Specifically, the Board ruled that

> [t]he requirement for subsequent testing to determine whether or not there is a continued presence of toxicity, and allowance for the permittee to be in compliance with the Permit requirements while making this determination, is a valid exercise of Ecology's permitting discretion.

AR at 1108. The regulations, however, do not require "a continued presence of toxicity" to establish noncompliance with the narrative water quality standard. Nor do they say anything about a "pattern of toxicity." Instead, as shown, they clearly establish that a failed WET test shows a violation of the acute toxicity standard, and therefore a violation of a maximum daily permit limitation.

The Board's order deferring to the Department's view that a single failed WET test does not violate the permit is thus inconsistent with the Department's own rules. Therefore, under the Administrative Procedures Act, it merits reversal unless the Department "explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency." RCW 34.05.570(3)(h).

This the Department fails to do. As already shown, the Department's principal justification, that a single WET test is too unreliable to show a toxic discharge, is belied by its own rules. Perhaps more to the point, Marshall admitted in his deposition that the regulations as originally written did not contemplate that a permittee could remain in compliance despite a statistically valid, failed WET test, and that he subsequently began writing permit conditions that allowed for such failures because "it's hard [for industry] to comply" and "it encourages the permittee to follow the process . . . [r]ather than challenging the permit or the individual test result." AR at 510-11, 515, 519. Allowing violations of water quality standards, especially for the convenience of permittees and regulators, does not provide a rational basis for disregarding

the plain language of the Department's rules and is an abdication of its responsibility to implement those rules.

The Department's interpretation of its rules and statutes is also inconsistent with its responsibility under the State Environmental Policy Act (SEPA), chapter 43.21C RCW. SEPA "directs that, to the fullest extent possible: (1) The policies, regulations, and laws of the state of Washington shall be interpreted and administered in accordance with the policies set forth in this chapter." RCW 43.21C.030. Among those policies is the recognition of "the responsibilities of each generation as trustee of the environment for succeeding generations," RCW 43.21C.020(2)(a), and the recognition that "each person has a fundamental and inalienable right to a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment." RCW 43.21C.020(3). Although these policies apply to the State generally, they speak with an insistent voice to the Department of Ecology. *See, e.g.*, RCW 43.21A.010. By condoning violations of its own standards through this permit, the Department has not acted in keeping with this trust.

B.    The Board's Order Conflicts with Governing Statutes and the Federal Regulatory Scheme

Both federal and state statutes are definitive in prohibiting the discharge of toxic pollutants into receiving waters. As discussed, one of the policies underlying the CWA is "that the discharge of toxic pollutants in toxic amounts be prohibited." 33 U.S.C. § 1251(a)(3). Consistently with this policy, the CWA prohibits "the *discharge* of any pollutant by any person," 33 U.S.C. § 1311, except in conformity with federal and state water quality standards. (Emphasis added.) A state statute, RCW 90.48.520 is even more categorical, stating that "[i]n no event shall the discharge of toxicants be allowed that would violate any water quality standard, including toxicant standards." As noted above, a departmental rule, WAC 173-205-070(1)(c),

plainly states that a failed WET test means that "the effluent has failed the test for compliance with the whole effluent acute toxicity limit."

Thus, a single failed WET test based on a statistically significant difference in survival shows that a discharge has occurred in violation of both federal and state statutes. In addition, 40 C.F.R. section 122.4 and RCW 90.48.520 each prohibit issuing NPDES permits that allow violations of state water quality standards. Therefore, condition S7 contradicts applicable state and federal statutes, as well as a federal rule. For these reasons also, the Board erred in upholding condition S7 to the extent it provided that a single failed WET test did not violate the permit.

C.  A Failed WET Test Result That the Department Determines To Be Anomalous Does Not Establish a Violation of Water Quality Standards

The WET regulations provide for only one instance in which a failed WET test does not indicate a violation of the water quality standard: anomalous results. The WET regulations specify that the Department "may determine any compliance test result to be anomalous . . . [and] notify a permittee to take another sample for toxicity testing because a compliance test result was anomalous and *could not be used to determine compliance* in accordance with this section." WAC 173-205-090(e), (f) (emphasis added). Thus, a failed WET test result the Department determines to be anomalous does not establish a violation of the narrative water quality standard.

This provision answers various arguments raised by BP and the Department. The Department argues that the Board properly deferred to its interpretation of the WET regulations because, due to the imprecision inherent in a test that relies on living organisms, a failed WET test does not prove that a toxic discharge actually occurred. Part III A of our analysis above shows that this position lacks an adequate factual basis and conflicts with the requirement that a

failed WET test be based on a statistically significant difference in mortality results. The exclusion of anomalous results further supports the reliability of a single failed WET test.

BP similarly contends that it is unfair, perhaps even unconstitutional, to base a permit violation on a test that poses some risk of false positive results. Wash. Court of Appeals oral argument, *Puget Soundkeeper v. Dep't of Ecology*, No. 45609-5-II (March 31, 2015), at 34 min. 35 sec. through 35 min. 35 sec. (on file with court). We disagree. The law does not demand logical certainty before the Department may sanction a regulated party: the constitution entitles even a criminal defendant only to proof of the charge beyond a reasonable doubt, a standard short of the certainty BP demands. *See In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). In the civil setting, a simple preponderance is typically sufficient.

BP's statistical analysis, purporting to show a significant risk of false positive results, fails to account for the likelihood that the Department will identify such errors as anomalies and disregard them. In addition, the Department's NPDES permit writer's manual directly contradicts BP's statistical analysis. The manual notes that the "confidence level only approximates the worst case false positive rate which exists when the two values being compared are relatively close together," and "[t]he further apart these values are, the less likely are false positive results." AR at 451. Thus, "a confidence level of 95% does not mean that 1 in 20 (5%) of failed WET tests is a false positive." AR at 451. Indeed, "if all of the organisms in the ACEC die and none die in the control, the probability . . . [of] a false positive is closer to 0 than 1 in 20." AR at 451. To reduce the risk of false positives, the manual advises including a provision "rais[ing] the confidence level to 99% when the differences in response are small." AR at 451. BP's permit contains such a provision. Thus, BP plainly overstates the risk that it could erroneously become subject to possible enforcement action.

The *Edison Electric* court noted that "WET tests will be wrong some of the time, which is why EPA warned against using a single test result to institute an action for a civil penalty," but nonetheless upheld the WET testing methods against an industry challenge. 391 F.3d at 1272 (citing 67 Fed. Reg. at 69,968). The *Edison Electric* court clearly contemplated that a failed WET test would constitute a permit violation, *see* 391 F.3d at 1271; but rejected concerns similar to BP's, holding EPA's statistical safeguards adequate to protect against arbitrary violations. *Edison Electric*, 391 F.3d at 1273. Regardless, whether the Department should act on a permit violation by seeking a civil penalty presents an entirely different question from whether a violation has occurred in the first place. *See Edison Electric*, 391 F.3d at 1272.

We agree with the *Edison Electric* court that the WET tests provide sufficient certainty that a toxic discharge has occurred. The WET rules as written adequately account for the possibility of unreliable test results. Under the regulations' plain language, we hold that upon failing a single WET test which the Department has not deemed anomalous, BP is in violation of federal and state law, including state water quality standards.

## CONCLUSION

A single failed WET test, not deemed anomalous by the Department, shows that the permittee has discharged toxic substances in violation of federal and state law, including state water quality standards. NPDES permits must be consistent with applicable state and federal law and must implement water quality standards set by state or federal statutes and regulations. Therefore, the Board erred as a matter of law in ruling that condition S7 of BP's NPDES permit was valid to the extent it provided that a single failed WET test did not violate the permit.

We reverse the Board's order and remand to the Department to revise the permit condition to specify that a single failed WET test, not deemed anomalous by the Department, establishes a violation of the NPDES permit.

Bjorgen, A.C.J.

We concur:

Lee, J.

Sutton, J.