Bjorgen, A.C. J.
(dissenting)
¶63 The application of the vested rights doctrine proposed by Snohomish County, King County, and the Building Industry Association of Clark County (collectively appellants), in my view, is both preempted by federal law and in conflict with governing state law. Therefore, I would affirm the decision of the Pollution Control Hearings Board (Board).
I. Federal Preemption
¶64 The issue in this appeal is whether the state vested rights doctrine excuses a specific class of applicants from compliance with new storm water regulations adopted by local governments to implement the 2013-2018 Phase I Municipal Storm Water NPDES[12] permit (2013-2018 Permit). The class at issue comprises those who filed a complete development application before July 1, 2015, but who will not have started construction by June 30, 2020. The 2013-2018 Permit and the Board’s ruling upholding it deems them subject to the new regulations. The appellants urge that the State’s vested rights doctrine shields those applicants from the reach of the new regulations.
¶65 The pulse of the federal Clean Water Act (CWA) is set by 33 U.S.C. § 1311(a), which bans the discharge of any *346 pollutant from a point source into the nation’s navigable waters, unless within applicable standards and subject to a permit. See also 33 U.S.C. §§ 1312, 1316-17, 1328, 1342, 1344. The principal permit under the CWA is the NPDES permit. The federal government has delegated the authority to issue NPDES permits in Washington to the state Department of Ecology. See RCW 90.48.260.
¶66 Of the various types of discharges,
[s]tormwater runoff is one of the most significant sources of water pollution in the nation, at times ‘comparable to, if not greater than, contamination from industrial and sewage sources.’ Storm sewer waters carry suspended metals, sediments, algae-promoting nutrients (nitrogen and phosphorus), floatable trash, used motor oil, raw sewage, pesticides, and other toxic contaminants into streams, rivers, lakes, and estuaries across the United States. . . . Urban runoff has been named as the foremost cause of impairment of surveyed ocean waters.
Envtl. Def. Ctr., Inc. v. U.S. Envtl. Prot. Agency, 344 F.3d 832, 840-41 (9th Cir. 2003) (footnote omitted) (quoting Richard G. Cohn-Lee & Diane M. Cameron, Urban Storm-water Runoff Contamination of the Chesapeake Bay: Sources and Mitigation, 14 Envtl. Prof. 10, 10 (1992)). To implement CWA requirements, Ecology issued the 2013-2018 Permit authorizing discharges from large and medium municipal storm water systems, subject to standards and conditions. Of those, condition S5.C.5 imposes new requirements on specified land development, including source control, flow control, and treatment, among others. Under this condition, local governments covered by the 2013-2018 Permit must adopt plans and regulations imposing these requirements on development proposals by June 30, 2015. At the heart of this appeal, condition S5.C.5.a.iii states that these plans and regulations shall apply to all applications submitted after June 30, 2015 “and shall apply to applications submitted no later than June 30,2015, which have not started construction by June 30, 2020.”
*347 ¶67 Subject to the intricacies and exceptions unpacked by the case law, “vesting”
refers generally to the notion that a land use application, under the proper conditions, will be considered only under the land use statutes and ordinances in effect at the time of the application’s submission.
Noble Manor Co. v. Pierce County, 133 Wn.2d 269, 275, 943 P.2d 1378 (1997). As noted, the 2013-2018 Permit required local governments to adopt new storm water regulations by June 30, 2015. With that, appellants argue, the Permit violates the vested rights doctrine, since condition S5.C.5.a.iii imposed those new regulations on applications submitted befoi'e that date, as long as construction will not have started by June 30, 2020. Whether the appellants are correct in this, however, need not detain the analysis since relieving this class of applicants from compliance with the new regulations is preempted by the CWA.
¶68 State law is preempted “ ‘to the extent of any conflict with a federal statute.’ ” Hillman v. Maretta, _ U.S. _, 133 S. Ct. 1943, 1949-50, 186 L. Ed. 2d 43 (2013) (quoting Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 372, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000)). Conflict preemption occurs “when compliance with both federal and state regulations is impossible or when the state law ‘stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.’ ” Hillman, 133 S. Ct. at 1950 (citations omitted) (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 2d 581 (1941)).
¶69 The objective of the CWA is to “restore and maintain the chemical, physical, and biological integrity of the Nation’s waters” and to achieve or maintain “water quality which provides for the protection and propagation of fish, shellfish, and wildlife.” 33 U.S.C. § 1251(a); PUD No. 1 of Jefferson County v. Wash. Dep’t of Ecology, 511 U.S. 700, 704, 114 S. Ct. 1900, 128 L. Ed. 2d 716 (1994). To serve this goal, the CWA broadly prohibits “the discharge of any *348 pollutant by any person,” except as authorized by enumerated statutory provisions. 33 U.S.C. § 1311(a); Puget Soundkeeper All. v. Pollution Control Hr’gs Bd., 189 Wn. App. 127, ¶18, 356 P.3d 753 (2015). More specifically, the CWA mandates that permits for discharges from municipal storm sewers require controls to reduce the discharge of pollutants to “the maximum extent practicable.” 33 U.S.C. § 1342(p)(3)(B).
¶70 State agencies may not issue NPDES permits
[w]hen the conditions of the permit do not provide for compliance with the applicable requirements of CWA, or regulations promulgated under CWA;

[or w]hen the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States.
40 C.F.R. § 122.4(a), (d). Washington law makes clear that these requirements apply to each discharge: WAC 173-220--150(l)(c) provides that “each issued [NPDES] permit shall require that . . . [a]ny discharge of any pollutant ... at a level in excess of that identified and authorized by the permit shall constitute a violation of the terms and conditions of the permit.” Puget Soundkeeper, 189 Wn. App. 127, at ¶ 20.
¶71 The appellants do not argue that the specific standards of the 2013-2018 Permit are not strict enough to serve the CWA’s purposes. Therefore, they do not dispute that the 2013-2018 Permit is a method of achieving the “maximum extent practicable” standard of 33 U.S.C. § 1342(p)(3)(B). Similarly, the Board concluded in its findings of fact, conclusions of law, and order, dated March 21, 2014 (2014 decision), that the 2013-2018 Permit’s low-impact development requirements, including those covering permeable pavement, bioretention, and the phasing of watershed basin planning, “constitute ... MEP,” which is the abbreviation for “maximum extent practicable.” Clerk’s Papers at 248.
*349 ¶72 Against this background, one must conclude that the permit’s standards are reasonably necessary to reduce the discharge of pollutants to “the maximum extent practicable,” as required by federal law. Among those standards is the one at issue here: that the Permit’s substantive requirements apply to projects for which applications were filed before July 1, 2013 but which will not have commenced construction by June 30, 2020. Similarly, one must conclude that this temporal choice of law provision is also reasonably necessary to meet the “maximum extent practicable” standard of 33 U.S.C. § 1342(p)(3)(B).
¶73 The state’s vested rights doctrine would directly obstruct these federal purposes. Under the permit, projects with applications submitted before July 1,2015 that did not commence construction by 2020 would be subject to the standards of the 2013-2018 Permit. Under the vested rights doctrine as expounded by appellants, projects within this window would escape those standards. Thus, the proposed application of the doctrine would result in greater discharge of pollutants into receiving waters and consequent greater compromise to the purity of those waters. While the CWA may not require choosing the least polluting of all conceivable alternatives in every situation, it does require that permits for municipal storm sewers reduce the discharge of pollutants to “the maximum extent practicable.” 33 U.S.C. § 1342(p)(3)(B). Applying the vested rights doctrine as appellants urge would frustrate the achievement of that standard, since, as shown above, subjecting projects within this window to the specific controls of the 2013-2018 Permit is a part of the permit’s reduction of polluting discharges to the maximum extent practicable.
¶74 The United States Congress recognized that the goals of the CWA cannot be achieved immediately, setting in 33 U.S.C § 1251(a)(1) the goal that the discharge of pollutants into the navigable waters of the United States be eliminated by 1985. Thirty years have now passed since the 1985 deadline. To use the flexibility shown by that deadline as a license *350 for further delay 30 years after its expiration is to risk passage into the absurd. Because application of the vested rights doctrine would frustrate accomplishment of the federal purposes, it is preempted under Hillman, 133 S. Ct. at 1950.
II. Conflict with State Law
¶75 The policy of the water pollution control statute at chapter 90.48 RCW is “to maintain the highest possible standards to insure the purity of all waters . . . and to that end require the use of all known available and reasonable methods by industries and others to prevent and control the pollution of the waters of the state of Washington.” RCW 90.48.010. Similarly, RCW 90.54.020(3)(b) states:
Regardless of the quality of the waters of the state, all wastes and other materials and substances proposed for entry into said waters shall be provided with all known, available, and reasonable methods of treatment prior to entry . . . wastes and other materials and substances shall not be allowed to enter such waters which will reduce the existing quality thereof, except in those situations where it is clear that overriding considerations of the public interest will be served.
These designs are also reflected in the state antidegra-dation policy to “[r]estore and maintain the highest possible quality of the surface waters of Washington” and to “[e]n-sure that all human activities that are likely to contribute to a lowering of water quality, at a minimum, apply all known, available, and reasonable methods of prevention, control, and treatment (AKART).” WAC 173-201A-300(2)(a), (d).
¶76 Conclusions 10, 17, and 43 of the Board’s 2014 decision determined that the 2013-2018 Permit’s low-impact development requirements, including those covering permeable pavement, bioretention, and the phasing of watershed basin planning, “constitute AKART.” The 2013-2018 Permit thus would require AKART of projects with applications submitted before July 1, 2015 that did not com- *351 menee construction by June 30, 2020. The theory of the vested rights doctrine urged by appellants would relieve that class of projects from the duty to provide AKART. Thus, this application of the vested rights doctrine would conflict with RCW 90.48.010, RCW 90.54.020(3)(b), and WAC 173--201A-300(2). The proper resolution of that conflict depends on the source of the vested rights doctrine.
¶77 In West Main Associates v. City of Bellevue, 106 Wn.2d 47, 51, 52, 720 P.2d 782 (1986), our Supreme Court struck down Bellevue’s local vesting ordinance because it did not meet the due process standards of the Fourteenth Amendment to the United States Constitution. The ordinance provided that rights would vest only upon filing a building permit application but prohibited the filing of such an application until up to eight other permits or reviews had been approved. Id. at 49. The ordinance further barred filing a building permit application until any appeal of four of these other approvals had been resolved. Id. Not surprisingly, the court found this artifice to be unconstitutional. The court, however, did not hold that the State’s general vesting rule, that projects are subject to the law in effect when a complete application is filed, is compelled by either the state or federal constitution. To do so would have approached the extremity of implying that the reliance-based vesting rule current in the great majority of states was unconstitutional. More recently, our Supreme Court held in Town of Woodway v. Snohomish County, 180 Wn.2d 165, 173, 322 P.3d 1219 (2014), that “[w]hile it originated at common law, the vested rights doctrine is now statutory.” Accord Potala Vill. Kirkland, LLC v. City of Kirkland, 183 Wn. App. 191, 202, 334 P.3d 1143 (2014), review denied, 182 Wn.2d 1004 (2015). Although arbitrarily fluctuating governmental standards may scant the degree of fairness required by the constitution, our minority vesting doctrine is not constitutionally required medicine for that problem.
¶78 For these reasons, the conflict between the appellants’ view of the vested rights doctrine and state water *352 quality law must be analyzed as a conflict between two statutes. When faced with apparently conflicting statutes, we employ a two-step process. See Gorman v. Garlock, Inc., 155 Wn.2d 198, 210, 118 P.3d 311 (2005). First, we examine whether the statutes can be harmonized and effect given to both. City of Lakewood v. Pierce County, 106 Wn. App. 63, 71, 23 P.3d 1 (2001). Then, if the statutes truly conflict and cannot be reconciled, we give preference to a more specific or more recently enacted statute. Tunstall v. Bergeson, 141 Wn.2d 201, 211, 5 P.3d 691 (2000).
¶79 Turning to the first step, the conflict between the two positions seems beyond the reach of harmonization: one would exempt a certain class of projects from the new standards and one would not. Chronology likewise is of little help. On one hand, the antecedents of RCW 90.48.010 go back to 1945, although its modern form was enacted in the early 1970s. Chapter 90.54 RCW was enacted in 1971. The lineage ofWAC 173-201A-300 is more recent. See Wash. St. Reg. 03-14-129 (effective Aug. 1, 2003). On the other hand, the two principal vesting statutes, RCW 19.27.095 (building permits) and RCW 58.17.033 (preliminary subdivision approval), were each enacted in 1987.
¶80 A better window into legislative intent lies in the nature of the competing statutes. The vested rights doctrine is a general rule covering all development within its scope, without specific regard to the effects or interests at stake. RCW 90.48.010 and WAC 173-201A-300, in contrast, are aimed at protecting a specific resource, the waters of the state, from a specific threat, pollution. Chapter 90.54 RCW is of similarly focused scope, directed at ensuring the proper utilization of the state’s water resources. RCW 90.54.010. These measures were enacted pursuant to legislative recognition of the value of the resource and the presence of the threat. RCW 90.48.010; RCW 90.54.010. The narrowed circumference of both focus and purpose in the water quality measures suggests that within those bounds the more general vesting doctrine must give way.
*353 ¶81 This conclusion flows also from our Supreme Court’s view of the purpose of the vested rights doctrine. In West Main, the court held that the purpose of the vesting doctrine is to allow developers to determine, or “fix,” the rules that will govern development. 106 Wn.2d at 51. The court then took a more nuanced view in Erickson & Associates v. McLerran, 123 Wn.2d 864, 873-74, 872 P.2d 1090 (1994), recognizing that
[t]he practical effect of recognizing a vested right is to sanction the creation of a new nonconforming use. A proposed development which does not conform to newly adopted laws is, by definition, inimical to the public interest embodied in those laws. If a vested right is too easily granted, the public interest is subverted.
¶82 To use the vested rights doctrine to exempt from compliance those who filed before July 1,2015 but who still have not begun construction over five years later is to engage in the sort of subversion of the public interest against which Erickson warned. Reversing the defilement of our public waters stands high in any ranking of public interest. On the other hand, the public interest in allowing applicants to proceed under the standards current when they applied declines with time, as those standards become more obsolete and the excuses for inaction become weaker. Perhaps more to the point, the 2013-2018 Permit was adopted in 2012, effective in 2013. Thus, there can be little surprise in applying the permit’s standards to those applying before July 1, 2015.
¶83 The purposes of the vested rights doctrine and our clean water laws are not in equipoise. The scrutiny of those purposes, as well as the specific nature of the latter, shows that protection of the state’s waters must prevail in its conflict with the vested rights doctrine. By relieving a class of projects from the duty to provide AKART, the vested rights doctrine would conflict with RCW 90.48.010, RCW 90.54.020(3)(b), and WAC 173-201A-300(2). In resolving that conflict, these statutes have the last word.
*354 III. Conclusion
For the reasons set out above, I would affirm the order of the Board.[13]
Review granted at 185 Wn.2d 1026 (2016).

 National Pollutant Discharge Elimination System.

 This opinion does not examine whether the vested rights doctrine would apply in these circumstances in the absence of federal preemption or conflict with state statutes.