IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| PUGET SOUNDKEEPER ALLIANCE,<br><br>                    Appellant,<br>       v.<br><br>WASHINGTON DEPARTMENT OF ECOLOGY, SNOHOMISH COUNTY, CITY OF SEATTLE, CITY OF TACOMA, PIERCE COUNTY, CITY OF BELLEVUE, KING COUNTY, and WASHINGTON POLLUTION CONTROL HEARINGS BOARD,<br><br>                    Respondents. | No. 84492-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, C.J. — Puget Soundkeeper Alliance (Soundkeeper) is a Washington nonprofit corporation dedicated to protecting and preserving the waters of Puget Sound and the species that live in it. Soundkeeper advocates for the adoption of policies throughout the Puget Sound watershed that will protect water quality and habitat health. For many years, it has been a major voice in the development of municipal stormwater management rules and regulations, and its contributions and criticisms have at times pushed Washington to adopt more aggressive protections. Soundkeeper demonstrates the powerful good that can be accomplished for the environment and our local waterways by both cooperative and adversarial interactions between government and private organizations.

In this case, Soundkeeper challenges the permits issued by the Department of Ecology to municipal stormwater system operators in Washington State. It points to the existence of streams in the Puget Sound region with pollutant levels increasingly exceeding standards set by Ecology itself and raises concerns about high pre-spawn mortality rates in Coho salmon. It asserts that these ever more polluted streams and the resulting harm from the pollutants indicate that the current stormwater permits are ineffective and require restructuring. It argues this is because the permits' compliance mechanism allows discharges of some polluted waters from municipal stormwater systems into protected waters, without counting those discharges as per se violations of the permits themselves. It contests this compliance mechanism's conformity with various state and federal statutes and regulations. The Pollution Control Hearings Board reviewed Ecology's permits and upheld them. Soundkeeper now appeals the Board's conclusions. We affirm.

FACTS

Municipal Stormwater Systems

This appeal concerns the legality of permits granted by the Washington State Department of Ecology to various operators of Municipal Separate Storm Sewer Systems (MS4s) located in Washington State. An MS4 is "a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, manmade channels, or storm drains)" owned and operated by a municipal entity,[1] designed or used for

---

[1] Throughout this opinion, we will refer to the municipal entities which operate the stormwater systems, and which are party to this case, as MS4s.

collecting or conveying stormwater, and which is not combined with a sewer. 40 C.F.R. § 122.26(b)(8).

Unsurprising, MS4s are extraordinarily complex systems composed of many interrelated parts of our built and natural environment. The MS4s party to this case collect stormwater from across the counties or cities they serve and discharge that stormwater into local bodies of water at hundreds to thousands of locations. This water is often—if not always—polluted to one degree or another.

That MS4 discharges are polluted is the result of activities beyond the control of the entities that own and manage the MS4s. This is unlike other discharges of water pollution, many of which are the results of discrete construction, industrial, or other concerns that actively generate the pollutants they discharge into waters protected by state or federal statute.

This distinction arises from the inherent structure of MS4s. The water that first enters and then exits an MS4 "comes into contact with essentially all surfaces exposed to the sky." In the process it will pick up potential pollutants that have accumulated on those surfaces, "including soil and other particles, nutrients, metals, salts, natural and synthetic organic compounds, oil and grease, etc." These pollutants originate in a broad range of natural and human activity, including lawful, everyday activities such as driving, property upkeep, and business operations.

The history of Seattle's MS4 is emblematic of MS4s complexity and the competing purposes they must balance. Drainage infrastructure in what is now Seattle was originally "built to avert flooding and to protect property and public

3

health and safety." It was not centrally designed and developed, but instead grew piecemeal as local communities were established and later annexed by the city government. Nor is it, even now, a single comprehensive system; parts of Seattle are managed by mixed sewage and stormwater systems, while some are served only by the MS4 that is party to this case. The quality of the waters into which the Seattle MS4 drains is therefore partially dependent on Seattle's discharges, but also on the activities of others outside of the city's control.

The result is that MS4s balance multiple purposes, operate interdependently with each other and with other polluters, compete with other entities for space and resources, have inherited systems not always well designed for present purposes, and enjoy only limited control over the source of the pollutants they discharge. To the degree that they are asked to reduce that pollution, they alone are given the task of solving the resulting problem caused by all involved.

### Structure of the Permits

Because they discharge into protected waters, MS4s are subject to a permitting process regulated under federal and state laws, the goal of which is to ensure that federal and state waters are clean and unpolluted. These permits are issued by the Washington Department of Ecology and are called "Phase I" and "Phase II" permits depending on the scale of the MS4 they seek to regulate. Phase I permits regulate discharges from "large" and "medium" MS4s, and include permittees such as the cities of Seattle and Tacoma, Clark, King, Pierce, and Snohomish Counties, the Port of Seattle, the Port of Tacoma, and various

4

other similarly sized entities. Phase II permits cover "medium MS4s" throughout the state, including Bellevue, Spokane, Everett, Yakima County, Thurston County, and others.[2]

Under federal law, the permits are re-issued every five years, and as part of that process their requirements are adjusted as necessary. 33 U.S.C. § 1311(d), (m)(3). Ecology issued the most recent versions of the permits on July 1, 2019. They are very detailed and thorough documents. The two permits at issue here—Phase I and one Phase II—total over 400 pages.[3]

In many of their particulars, the permits are identical, including their general structure. Sections S1 through S3 identify permittees, coverage area, the basics of what sort of discharge is authorized, and warn that permittees are responsible for their compliance with the permits' terms. Sections S6 through S9 establish monitoring and reporting requirements, compliance with "Total Maximum Daily Load" (TMDL) requirements, and certain permittee-specific rules. The permits' core regulatory provisions, at least for the purposes of this appeal, are located in sections S4 and S5.

---

[2] The size of an MS4 depends on the size of the population it serves. Those over a population of 250,000 people served are large, those between 100,000 and 250,000 are medium, and those below 100,000 are small. 40 C.F.R. § 122.26(b)(4) (defining large MS4s), (7) (defining medium MS4s), (16) (defining small MS4s).

[3] There are two Phase II permits—one for Western Washington and one for Eastern Washington. The Eastern Washington permit was not appealed and is not at issue.

1. <u>Section S5</u>

We first address Section S5, which imposes requirements on permittees that, if breached, are addressed through a compliance pathway located in S4. Jeff Killelea, the Water Quality Program Development Services Section Manager at Ecology, who led the development of the 2019 permits, describes Section S5 as the "heart" of the permits.

The S5 section of the Phase I permit requires that each permittee establish a "Stormwater Management Program." Phase I programs must include a number of aspects, such as mapping water sources, communicating with other MS4s and the public, creation of pollutant source control methods, creation of structural controls, etc. The Phase II programs are similar in most respects, but some of the more specific requirements are less robust.

The S5 sections of the permits' 2019 iterations include more and stricter requirements than previous permits' S5 sections. For instance, a comprehensive stormwater management action planning requirement is a new condition mandating that MS4s "identify retrofits, preferred locations, and land management strategies to better integrate stormwater management into their long range plans." The 2019 Phase I permit now also requires implementation of structural retrofits using a point system to define appropriate compliance levels. On the whole, the impact of these and other changes means that the 2019 permits are stricter than their predecessors, in line with an iterative approach that demands higher standards with every permitting cycle.

2. <u>Section S4</u>

Section S4—which is identical between the two permits—requires permittees' compliance with certain water quality standards and contains the permits' enforcement mechanism. It addresses circumstances in which site-specific water quality violations occur despite compliance with Section S5's programmatic requirements.

The core enforcement mechanism of the permits is located in Subsection S4.F, which dictates what should happen when an MS4's discharge violates any of a number of applicable state and federal water standard requirements. The permittee must notify Ecology "based on credible site-specific information that a discharge from the MS4 owned or operated by the Permittee is causing or contributing to a known or likely violation of water quality standards in the receiving water." If it determines that the permittee is "causing or contributing to" an actual water quality violation, Ecology may institute an "adaptive management response." This response typically involves imposing new, stricter best practices requirements. Ecology may also, however, take no additional action if it determines that the violation is already being addressed through another enforceable water quality clean-up plan or through implementation of other permit requirements. Importantly, if the permittee follows this process, a prohibited discharge does not become a violation of the permit itself.

Thus, S4.F's compliance pathway "uses a cooperative iterative process to correct site-specific violations of water quality standards while relying overall on a broader programmatic process to achieve jurisdiction wide compliance with water

7

quality standards over time."  But S4.F "was not intended to be the primary permit term to achieve eventual compliance with water quality standards on a programmatic or jurisdiction-wide basis."  The permits as a whole serve that purpose.

Section S4 has been heavily scrutinized over the years, and was the subject of a 2008 decision from the Pollution Control Hearing Board (Board), which oversees Ecology's permitting process.  Puget Soundkeeper All. v. Dep't of Ecology, No. 07-021 at (April 2, 2008) (Order on Dispositive Motions: Condition S4) [https://perma.cc/W66H-DTBL].  In that decision, the Board came to a number of legal conclusions about the applicability of federal and state laws and regulations to MS4 permits and remanded the case to Ecology for modification of S4 in compliance with edits dictated by the Board.  Puget Soundkeeper All.v. Dep't of Ecology, No. 07-021, at (Aug. 7, 2008) (Findings of Fact, Conclusions of Law and Order) [https://perma.cc/2ZNG-E2FJ].  Across multiple permitting cycles, S4 has remained substantially unchanged since that decision.

This appeal once again challenges S4's legality.

<u>Origin and History of This Lawsuit</u>

The Washington Association of Sewer and Water Districts initiated this suit against Ecology on July 29, 2019.  The Board consolidated the Association's challenge with another filed two days later by the Puget Soundkeeper Alliance.  A number of permittees moved to intervene as respondents, which the Board allowed.  These intervenor-respondents include King, Pierce, and Snohomish

Counties, and the cities of Bellevue, Seattle, and Tacoma. The Washington Association of Water and Sewer Districts eventually settled with Ecology, leaving only Soundkeeper's challenges.

Soundkeeper's claims before the Board and on appeal revolve around the undisputed fact that many of Washington's waters contain levels of pollutants that exceed applicable water quality standards. A number of streams in the Puget Sound region fail to meet requirements under the federal Clean Water Act[4] (CWA) and are therefore placed on the "303(d)" list of impaired waters.[5] Some of these streams have been categorized as more, not less, impaired over time, a process that has occurred despite previous versions of the currently challenged permits being in place.

Of particular concern to Soundkeeper is the high percentage of deaths—between 60 and 100 percent—of female Coho salmon in urban streams around Puget Sound before they are able to spawn. Ecology acknowledges that stormwater pollution from untreated highway runoff likely contributes to these mortality rates and that 6PPD-quinone, a chemical associated with tires, is a possible culprit. Soundkeeper asserts that there is a known, effective solution to the problem of polluted stormwater: treatment of water with "bio-infiltration"—having water run through soil and vegetation—before in is discharged into

---

[4] Formally known as the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. §§ 1251 to 1388.

[5] The 303(d) list is discussed below in the Federal Water Quality Standards section.

protected waters.[6]

Soundkeeper expresses alarm that no permittee has notified Ecology of the more recent 303(d) list impairments and their possible effect on salmon per S4.F. It is also concerned that in response to only one out of 243 S4.F reports sent to Ecology required any action other than what was already required under S5 of the permits. It points out that S4 has never been used to require any additional action by a permittee to address pre-spawn salmon mortality.

Soundkeeper moved for partial summary judgment and Ecology and the intervening permittees cross-moved. Before its final decision, the Board granted a joint motion dismissing several of the issues Soundkeeper had raised.[7] The remaining eight issues focused primarily on Section S4.F of the Phase I and Phase II permits.

Through a December 2021 letter, the Board informed the parties of its intent to dismiss six of the remaining issues and to hear the remaining two. By a joint motion, the parties stipulated to the dismissal of the remaining issues and the Board dismissed them. The Board issued its written final order in March 2022, detailing the reason for its dismissal of the six most hotly contested issues.

Soundkeeper petitioned for judicial review in Thurston County Superior Court. There, the parties jointly requested that the trial court certify the case to this court under RCW 34.05.518(2), which allows direct review of an

---

[6] Soundkeeper's citations to support this point do not appear to be to sworn evidence but rather to briefing at proceedings below but part of the Ecology factsheet does appear to support the contention.

[7] The joint motion is not in the record.

administrative agency's adjudicative proceeding by the Court of Appeals. It granted their request and Soundkeeper now appeals, assigning error to the Board's conclusion that Section S4 of the permits meets state and federal legal requirements.

BACKGROUND LEGAL PRINCIPLES

Because of the complexity of the federal and state laws regulating MS4s and the way in which the discretion extended to Ecology affects the standard of review, we begin by providing an overview of the applicable legal schemes.

Regulatory Context

This regulatory law governing MS4s is complex, the result of many interrelated state and federal laws and regulations, and has developed a corresponding wealth of jargon. The following overview summarizes this structure.

1. Federal Water Quality Standards

Federal water quality regulation is primarily contained within in one law: the Clean Water Act. The CWA was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The act prohibits "discharge of any pollutant by any person" from any "point source"[8] into the navigable waters of the United States without prior

---

[8] A point source is usually "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). MS4s are point sources requiring NDPES permits. Snohomish County v. Pollution Control Hr'gs Bd., 187 Wn.2d 346, 351-52, 386 P.3d 1064 (2016). But—thanks to the CWA's 1987 Water Quality Act

approval, and establishes a permitting process to provide that approval. 33 U.S.C. § 1311(a); 33 U.S.C. § 1362(12); 33 U.S.C. § 1342(a). The permitting process is titled the National Pollutant Discharge Elimination System, or NPDES. 33 U.S.C. § 1342. States may request authorization to administer their own NPDES permits, assuming what would otherwise be the duty of the United States Environmental Protection Agency (EPA). 33 U.S.C. § 1342(b); 33 U.S.C. § 1251(d). Washington has done so, designating Ecology as the responsible state agency. RCW 90.48.260(1).

NPDES permit approval is subject to the discharge's conformity to various standards. 33 U.S.C. § 1342(a). Permits must generally require application of the "best practicable control technology [BPT] currently available." 33 U.S.C. § 1311(b)(1)(A). Crucially, however, they must also require the permitholder to meet "any more stringent" water quality standards, treatment standards, and compliance schedules[9] established under any state or federal law or regulation. 33 U.S.C. § 1311(b)(1)(C). Although the BPT requirement is concerned with practical limitations, the application of "more stringent" standards may mean that certain discharges are prohibited regardless of practicality. Defs. of Wildlife v.

---

amendments to the CWA, discussed below—unlike other point sources, MS4s are regulated through "general permits" covering an entire geographic area, and they consequently do not have to seek a permit for every conveyance under their control that discharges into a protected water. Envtl. Def. Ctr., Inc. v. U.S. Envtl. Prot. Agency, 344 F.3d 832, 853 (9th Cir. 2003); 33 U.S.C. § 1342(p)(3)(B)(i).

[9] A compliance schedule is "a schedule of remedial measures including an enforceable sequence of actions or operations leading to compliance with an effluent limitation, other limitation, prohibition, or standard." 33 U.S.C. § 1362(17).

Browner, 191 F.3d 1159, 1163 (9th Cir. 1999); Puget Soundkeeper All. v. Pollution Control Hr'gs Bd., 189 Wn. App. 127, 138, 356 P.3d 753 (2015).

"More stringent" water quality standards exist in a number of forms. Under the CWA, states must designate waters for specific uses, such as propagation of wildlife or recreation. 40 C.F.R. § 131.10. Based on the designated use, states must establish "narrative" or "numeric" criteria to create water quality targets. 40 C.F.R. § 131.11; see also 33 U.S.C. § 1313(c). Numeric criteria set acceptable concentration levels for particular pollutants in waters, "*e.g.*, no more than .05 milligrams of chromium per liter." Am. Paper Inst., Inc. v. U.S. Envtl. Prot. Agency, 996 F.2d 346, 349 (D.C. Cir. 1993).[10]

Narrative criteria are broader and more open to interpretation in any particular instance, "*e.g.*, no toxic pollutants in toxic amounts." Am. Paper Inst., 996 F.2d at 349. They can serve as a means of establishing standards in instances where numeric criteria have not been set. For instance, Washington has not set a numeric criterion for 6PPD-quinone, the chemical the parties agree is likely harming salmon, but application of narrative criteria nonetheless ensures that it cannot be discharged in unrestricted amounts.

Criteria are met through the application of two regulatory methods: best management practices and effluent limitations. Best management practices (BMP), as defined by Washington and federal code, are "schedules of activities,

_____

[10] For instance, Washington's numeric criteria for toxic substances in surface waters are set out in 40 C.F.R. § 131.45 and WAC 173-201A-240 based on designations established in WAC 173-201A-200 (fresh waters) and WAC 173-201A-210 (marine waters).

prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution." WAC 173-226-030(3); 40 C.F.R. § 122.2. They come in many forms, but might include, "treatment requirements, operating procedures, and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage." WAC 173-226-030(3). Bio-infiltration, Soundkeeper's suggested solution to the salmon mortality problems caused by stormwater runoff carrying 6PPD-quinone, is a form of BMP.

Effluent limitations, on the other hand, are " 'restrictions on the quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged' " into protected waters. Wash. State Dairy Fed'n v. Ecology, 18 Wn. App. 2d 259, 288, 490 P.3d 290 (2021) (quoting Our Children's Earth Found. v. U.S. Envtl. Prot. Agency, 527 F.3d 842, 848 (9th Cir. 2008)) (alterations in original omitted); 33 U.S.C. § 1362(11). They often "consist[] of a requirement to abide by a specific numeric criterion for a given pollutant," ensuring that no more than a particular quantity of that pollutant is discharged. Dairy Fed'n, 18 Wn. App. 2d at 289-90. Effluent limitations are frequently imposed through calculation of TMDL, defined in Ecology's permits as "the maximum amount of a pollutant that a water body can receive and still meet water quality standards, and an allocation of that amount to the pollutant's sources."

Under the CWA, each state must identify waters within its boundaries that have failed to attain applicable water quality standards—whether numeric or narrative—despite the regulations required by 33 U.S.C. § 1311(b). 33 U.S.C.

14

§ 1313(d)(1)(A), (3).  The list of polluted waters developed under this section is known as the "303(d)" list, after the section of the CWA establishing the list.  See Pub. L. No. 92-500 § 303 (enacting the language of 33 U.S.C. § 1313).  The state must establish TMDLs for the pollutants causing those 303(d) waters to violate water quality standards.  33 U.S.C. § 1313(d)(1)(C).  Through this pathway, no permit may allow a permittee regulated by 33 U.S.C. § 1311 to discharge more of the pollutants that have caused a 303(d) water to become impaired into that water.

Permittees not in compliance with their permits may be subject to governmental enforcement actions.  33 U.S.C. § 1319.  Regulators can enforce the CWA through a range of administrative remedies or by bringing civil or even criminal actions.  33 U.S.C. § 1319.  But the CWA also provides for regulation through citizen suit, either against the violating permittee or against the agency charged with administering the Act.  33 U.S.C. § 1365(a).  Civil penalties can reach $25,000 per violation per day.  33 U.S.C. § 1319(d).

The result of this regulatory scheme is that the usual NPDES permit strictly limits the quantities of pollutants dischargeable into regulated waters.  When specific waters are found to be out of compliance with applicable standards, NPDES permits that allow polluted discharges into those waterways ratchet up their requirements, potentially prohibiting discharge of certain pollutants in any quantity.  The sticky wicket for MS4s is that, unlike most permittees—e.g., a chemical plant or agricultural facility—they do not generate the pollutants they discharge, and the goal of eliminating the pollutants from

15

hundreds and thousands of point sources is a task that can only be remedied over time.

2.  Applicability of Federal Standards to MS4s

Because of MS4s' complexity, competing purposes, and the separation between them and the source of the pollutants they carry, treatment of stormwater discharges was the subject of significant debate in the CWA's early years.  Defs. of Wildlife, 191 F.3d at 1163.  EPA initially exempted stormwater discharges from the CWA's requirements.  Def. of Wildlife, 191 F.3d at 1163; see 40 C.F.R. § 125.4 (1975).  But after the Court of Appeals for the District of Columbia invalidated this exemption, EPA issued regulations governing stormwater discharges and, in 1987, Congress passed the Water Quality Act,[11] amending the CWA.  Defs. of Wildlife, 191 F.3d at 1163.

Under the Water Quality Act amendments, municipal stormwater discharge permits are subject to the particular provisions of 33 U.S.C. § 1342(p).  Defs. of Wildlife, 191 F.3d at 1163-64.  The amendment created a new standard, the "maximum extent practicable" (MEP) standard.  33 U.S.C. § 1342(p)(3)(B)(iii).  Under it, NPDES permits for MS4s "require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate."  33 U.S.C. § 1342(p)(3)(B)(iii).  Notably, the Water Quality Act amendments to the CWA do

---

[11] Water Quality Act of 1987, Pub. L. No. 100–4, 101 Stat. 7 (1987) (codified as amended in scattered sections of 33 U.S.C.).

not themselves impose the strict compliance with state and federal water quality standards imposed on NPDES permittees under 33 U.S.C. § 1311(b)(1)(C) and 33 U.S.C. § 1313(d) (TMDLs addressing 303(d) waters).

Following the Water Quality Act amendments, the question became whether municipal stormwater permittees were subject to both § 1311 (the original CWA requirements) *and* § 1342 (the Water Quality Act amendments), or only the latter. If only the latter, then the many "more stringent" water quality standards set through code and statute, and discussed above, would no longer apply to MS4s under the CWA.

In Defs. of Wildlife, the Ninth Circuit held that only the Water Quality Act amendments applied. 191 F.3d at 1164. After Defs. of Wildlife, NPDES permits issued to municipal stormwater permittees require different, lesser standards than typical NPDES permits. 191 F.3d at 1165. Defs. of Wildlife relieves municipal stormwater permittees of the burden of strict compliance with the "more stringent" water quality standards, treatment methods, and compliance schedules otherwise mandated by the CWA. Compare 33 U.S.C. § 1342(p)(3)(B)(i)-(iii) (governing municipal stormwaters) with 33 U.S.C. § 1311(b)(1)(A)-(C) (normal permitting rules).

3. State Water Quality Standards

Washington developed its own water quality standards, separate from and predating those of the CWA, through the Water Pollution Control Act of 1945 (WPCA), Chapter 90.48 RCW. LAWS OF 1945, Ch. 216; RCW 90.48.010. While the CWA sets a floor for the regulation of water quality, it explicitly allows states

17

to impose more exacting standards. 33 U.S.C. § 1370. State and federal regulations therefore both apply to Washington waters.

The WPCA declares Washington's intent "to maintain the highest possible standards to insure the purity of all waters of the state consistent with public health and public enjoyment thereof, the propagation and protection of wild life, birds, game, fish and other aquatic life, and the industrial development of the state." RCW 90.48.010. In service of these ends, it makes it "unlawful for any person to . . . discharge into any waters of this state . . . any organic or inorganic matter that shall cause or tend to cause pollution of such waters according to the determination of the department." RCW 90.48.080. Like the CWA, the WPCA creates a permitting process that Ecology administers, prohibiting unpermitted discharge of "waste" into state waters. RCW 90.48.020 (administration); RCW 90.48.160 (permits).

As part of any permit issuance or reissuance, Ecology must "incorporate permit conditions which require use of all known, available, and reasonable [technologies and] methods to control toxicants." RCW 90.48.520. This requirement is known as the AKART standard.[12] Using rulemaking authority granted to it by the WPCA, Ecology has promulgated regulations expanding on

---

[12] The statute requires "waste disposal permit[s]" for persons conducting "commercial or industrial operation[s]." RCW 90.48.160. No party challenges that AKART standards apply to MS4s under Washington law or that references to "wastewater" throughout Chapter 90.48 RCW include stormwater, though this has been a point of contention in the past. Puget Soundkeeper All., No. 07-021 (Aug. 7, 2008) (Findings of Fact, Conclusions of Law, and Order: Condition S4) [https://perma.cc/2ZNG-E2FJ] (concluding stormwater is wastewater under the WPCA).

the WPCA's statutory scheme.  See RCW 90.48.035 (rulemaking authority).  Many of these regulations will be discussed in more detail below.

The WPCA's enforcement mechanisms differ from those of the CWA.  Any permittee in compliance with the terms and conditions of the permits is exempted from civil and criminal penalties that would otherwise flow from discharges that violate water quality standards.  WAC 173-201A-510(1)(a).  Unlike the CWA, the WPCA does not appear to allow for enforcement other than by Ecology.  See RCW 90.48.420 ("The department of ecology . . . shall be solely responsible for establishing water quality standards for waters of the state.").  Ecology must, however, modify permits "when it is determined that the discharge causes or contributes to a violation of water quality standards."  WAC 173-201A-510(1)(a).  And where a permittee fails or refuse to comply with permit requirements, Ecology may revoke the permit for that permittee or take direct enforcement action.  WAC 173-226-180(5); RCW 90.48.037 (allowing Ecology to enforce through legal suit).  In this way, Washington law and regulations confer considerable discretionary authority to Ecology in determining how to structure and implement Washington's clean water policies.

Standard of Review

Our analysis of the issues in this case is heavily informed by the applicable standard of review.  Ecology and the intervenor-respondents contend that Ecology's decisions concerning the permits' structure and content should be reviewed through the deferential "arbitrary and capricious standard."  The tenor of Soundkeeper's arguments assumes de novo review.

19

The Washington Administrative Procedure Act (APA), chapter 34.05 RCW, governs state court review of administrative agency actions. RCW 34.05.510. It also guides review of decisions made by the Pollution Control Hearings Board. Port of Seattle v. Pollution Control Hr'gs Bd., 151 Wn.2d 568, 587, 90 P.3d 659 (2004).

Under the APA, we may grant relief where the reviewed agency erroneously interpreted or applied the law. RCW 34.05.570(1)(c); RCW 34.05.570(3)(d); Port of Seattle, 151 Wn.2d at 587. We interpret the meanings of statutes de novo. Port of Seattle, 151 Wn.2d at 587. But where a statute is ambiguous and it falls under the agency's expertise—here, either Ecology's or the Board's—we treat the agency's interpretation of the statute with deference so long as it does not conflict with the statute. Port of Seattle, 151 Wn.2d at 587. We accord Ecology's interpretations of the federal CWA and related regulations "great weight" because it is entrusted with the Act's administration. Port of Seattle, 151 Wn.2d at 594 (addressing statute), 599-600 (addressing regulation). Where Ecology and the Board agree "we are loath to override the judgment of both agencies, whose combined expertise merits substantial deference." Port of Seattle, 151 Wn.2d at 600. We may also grant relief if an agency's determination is "arbitrary or capricious." RCW 34.05.570(1)(c); RCW 34.05.570(3)(i).

The party challenging an administrative decision bears the burden of demonstrating its invalidity. RCW 34.05.570(1)(a). If the reviewing court is concerned with an administrative decision made on summary judgment, as is the case here, "the reviewing court must overlay the [Administrative Procedure Act]

20

standard of review with the summary judgment standard." Verizon Nw., Inc. v. Emp't Sec. Dep't, 164 Wn.2d 909, 916, 194 P.3d 255 (2008). Summary judgment is appropriate where undisputed facts viewed in the light most favorable to the nonmoving party entitle the moving party to judgment as a matter of law. Verizon Nw., Inc., 164 Wn.2d at 916. Review is limited to the record before the agency; here, the Board. RCW 34.05.558.

These standards mean that the most important step in our review of an agency action is determining whether the agency exercised a degree of discretion in the interpretation or implementation of a relevant law or regulation. Where it did, its decision stands unless the interpretation conflicts with a statute's meaning or the implementation was arbitrary and capricious.

ANALYSIS

Soundkeeper assigns error to the Board's conclusion "that Section S4 of the [permits] met the requirements of state and federal law." It contends that "the Permits have not been stringent enough to meet the basic requirements of either the Clean Water Act or Washington law with stormwater problems worsening and with stormwater continuing to cause and contribute to violations of water quality standards."

Soundkeeper identifies five corresponding legal issues. Two are clearly stated: "Whether 40 C.F.R. § 122.44[13] applies to the Permits" and whether

---

[13] 40 C.F.R. § 122.44 is the federal regulation governing the what standards are imposed in NPDES permits.

Ecology "violated its obligations to review and assess Section S4 . . . when it reissued the Permits to ensure [S4 meets the applicable legal standards]."

The remaining three issues, however, are less straightforward. They question:

> (1) whether Section S4 "fails to ensure that the discharges authorized by the Permits will not cause, have the reasonable potential to cause, or contribute to a violation of a water quality standard,"
>
> (2) whether Section S4 fails to comply with requirements to apply AKART and MEP standards, and
>
> (3) whether Section S4 fails to ensure compliance with limits more stringent than AKART "or water quality based effluent limits as necessary to meet Washington water quality standards or total maximum daily load cleanup plans."

These issue statements focus on the applicability of standards and laws to Section S4 alone, rather than the permits as a whole. Soundkeeper's framing is notable because, at least facially, the permits appear to explicitly incorporate *all* of the standards Soundkeeper contends they fail to ensure. The specifics of their argument are somewhat difficult to follow because the issues fail to cite to particular statutory or regulatory requirements, incorporate a standard of review, or reference the particular alleged facts leading to violations, and they fail to clarify whether the challenge is to the permits' drafting or enforcement.[14]

---

[14] Issue one, for instance, incorporates language found throughout 40 C.F.R. § 122.44(d)(1): "cause[], have reasonable potential to cause, or contribute[] to," without citing the regulation. See 40 C.F.R. § 122.44(d)(1)(i), (iii), (iv) and (vi). Issue three's mention of limits "more stringent" than AKART draws from similar language in 33 U.S.C. § 1311(b)(1)(A), but it does not clearly place in question that provision's applicability to MS4s. Issues one and three ask whether Section S4 fails to "ensure" discharges are not violative, while issue two asks whether the section fails to "comply" with AKART and MEP standards. Whether this difference in terminology is meaningful is uncertain.

Soundkeeper's briefing does not help to clarify its arguments. It often discusses the practical effects of the permits and Ecology's discretionary enforcement and drafting choices. But despite this, it acknowledges that it is not challenging Ecology's enforcement of the permits' provisions. Instead, it focuses on arguing that the permits' allowance of *any* discharge by MS4s into impaired waters[15] without the permittee being automatically out of compliance means that the permits are necessarily legally inadequate. In this context, it assails what it characterizes as Ecology's "truncated" use of Section S4, criticizing Ecology's decisions to trust to conditions already imposed under Section S5 to eventually cure water quality issues rather than imposing more restrictive conditions through an adaptive management plan. In short, though Soundkeeper's issue statements raise what are framed as pure questions of law, much of its argument focuses on matters that appear to be within Ecology's discretion.

On the whole, Soundkeeper appears to contend that the permits must both prohibit polluted discharges into impaired waters and hold in violation any permittees making such discharges. In light of this, we understand Soundkeeper to raise two issues, which encompass all of Soundkeeper's five issue statements:

(1) Does state or federal law or regulation require Washington's stormwater permits to hold out of compliance any MS4 that discharges a pollutant into a water impaired by that pollutant?

(2) If not, has Ecology arbitrarily and capriciously drafted the permits by excluding such a provision?

To answer these questions, we first address the statutory and regulatory provisions cited and discussed by Soundkeeper that might impose a bright-line

---

[15] I.e., those waters on the 303(d) list.

rule that stormwater permits must make any discharge into 303(d) waters a permit violation. We conclude that there is no such rule. We also conclude that Ecology did not act arbitrarily and capriciously by failing to include such a rule of its own volition.

### Existence of a Bright-Line Rule

Soundkeeper relies on a number of federal and state statutes and regulations to support the notion that there is a bright-line rule forbidding allowance of any discharge into impaired water. Our review of those statutes and regulations indicates the opposite. Rather, the statutes and regulations each grant Ecology crucial discretion either not to require strict effluent limits, or to enforce limits in the manner it finds most reasonable. Because Ecology enjoys this discretion, its actions must be analyzed not de novo, as Soundkeeper argues, but through an arbitrary and capricious lens.

At the outset, it is worth mentioning that the permits, by their own terms, require compliance with a great number of standards. Subsection S4.A broadly prohibits the discharge of any pollutants into Washington waters that would violate "any" water quality standard. Subsection S4.B more specifically prohibits discharges that would violate portions of Washington code governing surface- and ground-water quality standards and sediment management, and federal code on human health-based criteria.[16] Subsection S4.C requires reduction of

---

[16] Groundwater quality standards are set by Chapter 173-200 WAC, surface water quality standards by Chapter 173-201A WAC, sediment standards by Chapter 173-204 WAC, and the federal human health-based criteria are found in 40 CFR 131.45.

pollutants per MEP. Subsection S4.D requires use of AKART. And Subsection S4.E requires compliance with all water quality requirements included in the permit itself. Separately, the permit imposes effluent limits in the form of TMDLs. What the permits do not do under Section S4 is make any discharge whose pollutant levels exceed these limits a per se permit violation.

1. 33 U.S.C. § 1311

Since language in Soundkeeper's third issue statement—specifically its mention of "more stringent" standards—echoes language in 33 U.S.C. § 1311, we first, briefly address whether that statute applies to MS4s. We conclude that it does not.

Whether MS4s are subject to 33 U.S.C. § 1311 was directly addressed by Defenders of Wildlife—a federal case that does not directly bind us. 191 F.3d at 1164. Two Washington cases have cited Defenders of Wildlife, but neither directly engaged with its holding because neither concerned a municipal stormwater permit. Puget Soundkeeper All., 189 Wn. App. at 137-38 (concerning BP refinery oil spill); Dairy Fed'n, 18 Wn. App. 2d at 288-89 (concerning state waste discharge general permit for concentrated animal feeding operations). It has not, therefore, yet been adopted by the Washington courts.

Defenders of Wildlife concluded that § 1311(b) does not bind MS4s. 191 F.3d at 1164-65. It looked at language in 33 U.S.C. § 1342 that required industrial actors to comply with § 1311, by incorporation requiring that industrial stormwater discharges apply with "any more stringent limitation[s]." Defs. of Wildlife, 191 F.3d at 1164-65 (citing 33 U.S.C § 1342(p)(3)(A)). It contrasted this

25

explicit imposition of § 1311's standards on industrial actors with Congress's silence concerning § 1311's application to *municipal* actors. Defs. of Wildlife, 191 F.3d at 1164-65 (citing 33 U.S.C § 1342(p)(3)(B)(iii)). Municipal actors such as MS4s are still regulated, but only by the MEP standard. 33 U.S.C § 1342(p)(3)(B)(iii). Reasoning that Congress would not have explicitly incorporated § 1311 against one actor and failed to do so against another, it therefore concluded that MS4s are not bound by § 1311. Defs. of Wildlife, 191 F.3d at 1164-5. It also reasoned that to hold otherwise would render § 1342 all but superfluous, since the "more stringent limitation[s]" of § 1311 would almost inevitably control over the MEP standard. Defs. of Wildlife, 191 F.3d at 1165-66.

In addition, Defenders of Wildlife addressed arguments by intervening stormwater permittees that EPA lacked the power to impose 33 U.S.C. § 1311's greater requirements on them. 191 F.3d at 1166-67. It concluded that the EPA has the power to impose requirements such as those in 33 U.S.C. § 1311 at its discretion. Defs. of Wildlife, 191 F.3d at 1166-67. This is because the Water Quality Act's amendments to the CWA require MEP standards *in addition* to " 'such other provisions as the Administrator . . . determines appropriate.' " Defs. of Wildlife, 191 F.3d at 1166-67 (alteration in original) (quoting 33 U.S.C. § 1342(p)(3)(B)(iii). But those standards are not required by 33 U.S.C. § 1311 itself.[17]

---

[17] Soundkeeper asserts that "State case law has further confirmed that NPDES permits such as the Permits here may be issued only when the discharge in question will comply with water quality standards." It cites to Port of Seattle, 151 Wn.2d at 603. That case, however, did not concern MS4 permits, but instead an NPDES permit awarded to the Port of Seattle for its activities

We follow <u>Defenders of Wildlife</u> with respect to both these holdings. Its analysis is thorough and convincing, and the Board has already relied on it, including when drafting the language of Section S4.F, which entitles <u>Defenders of Wildlife</u>'s reasoning to deference. <u>Puget Soundkeeper All.</u>, No. 07-021 [https://perma.cc/2ZNG-E2FJ]. 33 U.S.C. § 1311(b)(1)(C)'s applicability to MS4s was superseded by the passage of 33 U.S.C. § 1342(p)(3)(B), which directly addresses MS4s and creates the MEP standard.

2. <u>40 C.F.R. § 122.44(d)</u>

We next consider the applicability of 40 C.F.R. § 122.44, the federal regulation governing the content of NPDES permits. 40 C.F.R. § 122.44(d) directs permitting agencies to include effluent limits in their NPDES permits under certain circumstances. Soundkeeper contends that this regulation applies to MS4s, asserting that "[t]here are no exceptions to the requirements of 40 C.F.R. § 122.44 . . . for stormwater." We disagree.

40 C.F.R. § 122.44 controls the requirements that permitting agencies must include in their NPDES permits. Paragraph (d) mandates that permits include "any requirements in addition to or more stringent than promulgated effluent limitations guidelines or standards under sections 301, 304, 306, 307,

---

expanding an airport runway at SeaTac Airport. <u>Port of Seattle</u>, 151 Wn.2d at 579-80. Its references to requirements of federal law that, for instance, "state-issued NPDES permits [must] comply with 33 U.S.C. § 1311 . . . [which] requires effluent limitations" do not, as a result, apply to this review of stormwater permits. <u>Port of Seattle</u>, 151 Wn.2d at 603. Rather, it's holdings must be understood as discussing the requirements that apply to non-stormwater NPDES permits.

Soundkeeper's various citations to <u>Dairy Fed'n</u>, 18 Wn. App. 2d 259 are not persuasive for the same reason.

318, and 405 of the CWA necessary to . . . [a]chieve water quality standards established under section 303 of the CWA." 40 C.F.R. § 122.44(d)-(d)(1). Further subdivisions of sub-paragraph (d)(1) describe more specific triggers for when permits must impose numeric effluent limits, including "[w]hen the permitting authority determines . . . that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above the allowable ambient concentration of a State numeric criteria." 40 C.F.R. § 122.44(d)(1)(iii). Soundkeeper evokes this language throughout its briefing, even when not directly referencing § 122.44.

The plain language of 40 C.F.R. § 122.44(d) indicates that it does not apply to MS4s. This is because the language that prompts the paragraph's application to any given NPDES permit is the relevance of "any requirements in addition to or *more stringent* than" other guidelines. 40 C.F.R. § 122.44(d) (emphasis added). The italicized language is precisely the terminology used in 33 U.S.C. § 1311(b)(1)(C), the portion of the CWA that serves as the pathway to impose effluent limits. As decided by Defenders of Wildlife, though, this section's relevance to MS4s has been negated by the passage of 33 U.S.C. § 1342. We see no reason to treat 40 C.F.R. § 122.44(d)'s use of the same terminology differently. We instead read it as incorporating by reference the "more stringent" standards imposed by 33 U.S.C. § 1311, along with those standards' application only to non-MS4 NPDES permittees.

If there were any ambiguity, the history of EPA's NPDES regulatory scheme further supports this interpretation of 40 C.F.R. § 122.44(d). Much of the

28

regulation's language originates in rules first promulgated in 1980, before the passage of the 1987 Water Quality Act amendments to the CWA, which addressed the issue of applying strict effluent limits to MS4s.  45 Fed. Reg. 33,449 (May 19, 1980). The regulation's original language, in keeping with existing statute, simply mandated permits' inclusion of any requirements necessary to "achieve water quality standards established under section 303 of CWA."  45 Fed. Reg. 33,449.

After the Water Quality Act became law, EPA promulgated new rules. Most notably, in January 1989, it promulgated 40 C.F.R. § 122.26.  54 Fed. Reg. 255 (Jan. 4, 1989).  Entitled "Storm water discharges," this regulation comprehensively lays out the permitting process for MS4s.  40 C.F.R. § 122.26. In June of the same year, EPA modified 40 C.F.R. § 122.44, adding seven new sub-paragraphs to 40 C.F.R. § 122.44, including paragraph (d), upon which Soundkeeper relies.  54 Fed. Reg. 23,872 (June 2, 1989).  Unlike § 122.44, § 122.26 does not extensively describe the standards permits must incorporate. 40 C.F.R. § 122.26.  Instead, it describes the permit application process, the parts of the application, and what sort of entity must receive stormwater permits. 40 C.F.R. § 122.26.

On this issue the Board concluded in prior proceedings in this case that 40 C.F.R. § 122.44(d) does not apply to municipal stormwater systems.  In support, it cited to Defenders of Wildlife and asserted that the regulation "derives its authority from" 33 U.S.C. § 1311, not from the stormwater-specific 33 U.S.C. § 1342.  Agreeing with Ecology and the intervenor-respondents, it ruled that 40

29

C.F.R. § 122.26 is instead the section of the C.F.R. that sets MS4 permit conditions.

Affording the Board and Ecology the deference they are due when interpreting the laws they administer, we mostly agree. But because portions of § 122.44 were promulgated after the passage of the Water Quality Act amendments, it is possible that their authority derives at least in part from 33 U.S.C. § 1342, contrary to the PCHB's conclusion. Relevantly, 40 C.F.R. § 122.44(k)(2) explicitly mentions stormwater discharges, meaning that we cannot read § 122.44 as a whole to exclude regulation of MS4s. More specifically, though, 40 C.F.R. § 122.44(k)(2) mentions stormwater discharges to specify that they may be regulated *through the use of best management practices*. This provision has a clear bearing on our analysis of § 122.44, and further supports reading paragraph (d) as not applying to MS4s. Because of this, to the degree that the Board was categorically denying that § 122.44 may be applied to MS4s and holding that only § 122.26 applies, we cannot agree.[18] But the Board is correct that § 122.44(d) does not demand the imposition of strict effluent limits on MS4s, nor that any discharge violating an effluent limit is a violation of the permits themselves.

We therefore conclude that as to 40 C.F.R. § 122.44's paragraph (d), the Board did not err.[19] Our conclusion is not unique. As recently stated by the

---

[18] Whether the Board adopted the narrower or broader of these holdings is not clear.

[19] We note that even if we were to conclude that 40 C.F.R. § 122.44(d) applied to MS4s, our analysis would not end. Instead of strict effluent limits,

Superior Court of New Jersey's Appellate Division, addressing § 122.44: "The overarching federal law for MS4s—33 U.S.C. § 1342(p)(3)(B)(iii)—is broad and flexible. It does not require [the permitting agency] to implement numeric effluent limitations; BMPs are appropriate." Delaware Riverkeeper Network v. New Jersey Dep't of Envtl. Prot., 463 N.J. Super. 96, 121, 229 A.3d 875 (App. Div. 2020). We agree.[20]

    3. RCW 90.48.520

Soundkeeper cites to one Washington statute that might require MS4 permits to impose strict, numeric effluent limitations. Because, however, this legal theory was not clearly raised in front of the Board and has not been comprehensively briefed on appeal, we decline to consider it.

RAP 2.5(a) allows us to "refuse to review any claim of error which was not raised in the trial court." It includes several exceptions to this principle, none of

---

another portion of the regulation, sub-section (k), allows permits to require only best management practices where "numeric effluent limitations are infeasible." 40 C.F.R. § 122.44(k)(3). Paragraph (k) is, as mentioned, the only part of the regulation that mentions stormwater management. This sub-paragraph's existence carves out substantial space for agency discretion to be exercised, a space seemingly tailor-made to function as a pressure relief valve for MS4s.

[20] In passing, Soundkeeper cites to 40 C.F.R. § 131.12(a) when asserting that "Ecology must . . . require additional pollutant controls where necessary to achieve water quality standards because the agency must ensure that pollutants in stormwater do not cause or contribute to a violation of water quality standards and do not degrade waters." It does not quote the provision, which is one of four citations made.

40 C.F.R § 131.12 requires states to develop "antidegradation" policies. Paragraph (a), cited by Soundkeeper, has four sub-parts. 40 C.F.R § 131.12(a)(1)-(4). Soundkeeper does not specify in what manner it relies on this provision, and we therefore do not address it. See Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

which is relevant here. RAP 2.5(a). Though our ability to review issues not raised below is permissive, we seldom exercise our discretion to reach an issue that has not first received treatment by the trial court. State v. McFarland, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995). This practice encourages efficient use of judicial resources, affords the trial court the opportunity to correct any errors, guarantees that counsel and parties are not blindsided by theories raised well into a case, and ensures that we remain a court of review, rather than addressing arguments in the first instance. See State v. Robinson, 171 Wn.2d 292, 304-05, 253 P.3d 84 (2011) (discussing issue preservation rule).

Here, insufficient argument was made below and on appeal to justify our review of RCW 90.48.520's relevance in the present case. A portion of the WPCA, RCW 90.48.520, reads:

> In order to improve water quality by controlling toxicants in wastewater, the department of ecology shall in issuing and renewing state and federal wastewater discharge permits review the applicant's operations and incorporate permit conditions which require [AKART] to control toxicants in the applicant's wastewater. Such conditions *may* include, but are not limited to [effluent limits and TMDLs]. . . . *In no event shall the discharge of toxicants be allowed that would violate any water quality standard*, including toxicant standards, sediment criteria, and dilution zone criteria.

(emphases added). Soundkeeper implicitly relies on this last sentence to assert that the permits must prohibit allowance of *any* discharge that would violate a water quality standard. But it relies on it only obliquely, not quoting or discussing the relevant language, asserting: "Washington law provides that in no event shall the discharge of toxicants be allowed to violate Washington water quality

standards, RCW 90.48.520, a prohibition that is repeated in Section S4.A of the Permits."

Meanwhile, this statute received almost no treatment in front of the Board. The Board did not consider RCW 90.48.520 beyond citing to it as the source of the AKART standard. And the closest Soundkeeper came to relying on it as an authority that binds Ecology's enforcement discretion is in a broad, and broadly supported, introductory sentence:

> Neither Ecology nor Intervenors dispute that applicable permitting law dictates that National Pollutant Discharge Permits ("NPDES") must include controls necessary to ensure that the discharges authorized by those permits, here stormwater discharges by cities and counties, do not cause or contribute to an exceedance of water quality standards and that state law requires that stormwater permits apply "all known and reasonable technology" to control and reduce pollutants in stormwater. RCW 90.48.010; WAC 173-201A-510(1) and 173-226-070; 40 C.F.R. § 122.44(d); *see also* RCW 90.48.520, and WAC 173-216-020 and 110(1)(a).

Soundkeeper's scattershot citation does not suffice to preserve an issue. Because RCW 90.48.520's impact on Ecology's discretion was not preserved, we decline to address it.[21]

---

[21] Though we decline to review this issue, we do not read RCW 90.48.520 as Soundkeeper does. Instead, we would read "allowed" to reflect only the legislature's intent to impose adherence to water quality criteria on MS4s. We would not read it as speaking to Ecology's discretion in matters of enforcement. This better matches the WPCA's grants of significant authority to Ecology. To adopt Soundkeeper's reasoning would result in MS4s, by their very nature, being almost per se out of compliance with Washington law.

4. Washington Administrative Code

Soundkeeper refers to WAC 173-201A-510(1), (3), and (4) and WAC 173-226-070, but none of these administrative code provisions supports its arguments. We address each in turn.

WAC 173-201A-510(1) directs that "[w]aste discharge permits, whether issued pursuant to [NPDES] or otherwise, must be conditioned so the discharges authorized will meet water quality standards."[22] But this requirement is not absolute: "No waste discharge permit can be issued that causes or contributes to a violation of water quality criteria, *except as provided for in this chapter*." WAC 173-201A-510(1) (emphasis added).

WAC 173-201A-510(3) addresses "[n]onpoint source and stormwater pollution." Sub-paragraphs (a) and (c) are directed at non-point sources pollution, and therefore do not apply to MS4s, which are point source polluters. Snohomish County v. Pollution Control Hr'gs Bd., 187 Wn.2d 346, 351-52, 386 P.3d 1064 (2016). Another, relevant part of the paragraph directs that "[b]est management practices shall be applied so that when all appropriate combinations of individual best management practices are utilized, violation of water quality criteria shall be prevented." WAC 173-201A-510(3)(b). Taken alone, this might support Soundkeeper's arguments. But the same sub-part goes on to say that "[i]f a discharger is applying all best management practices

_____

[22] While these regulations do not say exactly what criteria or water quality standards apply, they exist in the same chapter as the designations and numeric criteria developed under the CWA. See, e.g. WAC 173-201A-600 (for fresh waters) and WAC 173-201A-610 (for marine waters).

appropriate or required by the department and a violation of water quality criteria occurs, the discharger shall modify existing practices or apply further water pollution control measures, *selected or approved by the department*." WAC 173-201A-510(3)(b) (emphasis added). In this way, as previously held by the Board, it explicitly grants Ecology the discretion to decide how it will enforce its permits where a violation has occurred; Section S4.F, the compliance pathway, mirrors this enforcement model.

WAC 173-201A-510(4) likewise does not require strict effluent limits. The closest it comes is sub-paragraph (c), which says that "[f]or the period of time during which compliance with water quality standards is deferred, interim effluent limits shall be formally established." WAC 173-201A-510(4)(c). But these limits, the sub-paragraph quickly clarifies, are left to "the best professional judgment of the department" and "may be numeric or nonnumeric." WAC 173-201A-510(4)(c).

The next regulation cited by Soundkeeper, WAC 173-226-070, concerns general permit effluent limitations. Its first sub-paragraph, (a), allows that limitations "may" be imposed to ensure compliance with AKART. WAC 173-226-070(1). And it directs that they "shall" be incorporated into a general permit "if such limitations are necessary" to comply with water quality standards. WAC 173-226-070(2)(a). But it leaves Ecology the discretion to determine *when* such measures are necessary. WAC 173-226-070(2)(a)(i).

The same paragraph's second sub-part, though, says that

35

> Water quality-based effluent limitations must control all pollutants or pollutant parameters which the department determines are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion of state ground or surface water quality standards.

WAC 173-226-070(2)(b). The language "will cause, have the reasonable potential to cause, or contribute to" a violation of water quality standards matches the language found in 40 C.F.R. § 122.44(d)(1)(i). But even if this provision, read alone, might create a strict requirement that Ecology must impose strong effluent limits, WAC 173-226-180(1)(c) grants Ecology considerable discretion in determining schedules and methods of enforcement. It allows Ecology to create permit conditions as applicable to achieve water quality standards "[b]y any . . . method deemed appropriate by the department." WAC 173-226-180(1)(c). This catchall provision therefore serves to ensure that Ecology has discretion in the manner of its enforcement.

<u>Whether the Permits Are Arbitrary and Capricious</u>

Lastly, we address Soundkeeper's arguments that Ecology acted arbitrarily and capriciously when it exercised its discretion in drafting the permits. First, we consider Soundkeeper's assertion that Ecology failed to review the permits for compliance with the various applicable standards, and specifically failed when it readapted section S4.F without amendment. Second, having determined that no statutory or regulatory provision creates a bright line rule requiring Ecology's MS4's permits to hold out of compliance any permittee that discharges pollutants in excess of effluent limits, we turn to whether the permits

were arbitrarily and capriciously drafted because they exclude such a requirement.

Arbitrary and capricious actions are " 'willful and unreasoning and taken without regard to the attending facts or circumstances.' " Port of Seattle, 151 Wn.2d at 589 (quoting Wash. Indep. Tel. Ass'n v. Wash. Utils. Transp. Comm'n, 149 Wn.2d 17, 26, 65 P.3d 319 (2003)). But "[w]here there is room for two opinions, and the agency acted honestly and upon due consideration, [the] court should not find that an action was arbitrary and capricious, even though [it] may have reached the opposite conclusion." Port of Seattle, 151 Wn.2d at 589.

A party challenging an agency action under this standard therefore bears a heavy burden of proof and persuasion. Soundkeeper has not met its burden.

1. Re-adoption of S4 Without Amendment

Soundkeeper contends Ecology failed to review or assess the permits' Sections S4 for compliance with AKART, MEP, C.F.R. § 122.44, or various portions of the WAC. It also contends that Ecology has admitted to not conducting this review. We disagree on both counts.

First, we disagree that Ecology has admitted that it failed to conduct a review. Soundkeeper's only supporting citation is an interrogatory answer asserting relitigation of Section S4 was estopped by the Board's 2008 decision. This does not constitute an admission of the sort Soundkeeper represents.

Moreover, Soundkeeper's assertion is contradicted by the record. Ecology "made the AKART and MEP findings as to the Permits as a whole," according to Jeff Killelea, who lead the reissuance. The record includes redlined

37

versions of the 2019 permits that track every change made from the last iteration; though the permits' general structure survives, few paragraphs remain untouched, and some portions are entirely new. For instance, Section S5 now includes the comprehensive stormwater management action planning requirement, a novel imposition on the permittees. Furthermore, Ecology solicited and responded to public comments during the permits' development. Section S4 survived relatively unscathed—though not totally without alteration—because Soundkeeper relied on the Board's previous approval of section S4, and was not "aware of any change in circumstance since [the Board's decision] that would warrant significantly altering" section S4.

Ecology's decisions while drafting the permits were therefore not willful and unreasoning, nor were they made without regard to the attending facts or circumstances. Instead, after careful consideration, Ecology focused on strengthening the Section S5 conditions, the heart of the permits, and relied on Section S4 to serve its continuing purpose as a corrective tool.

2. Arbitrary and Capricious Drafting

Finally, we must decide whether the existence of more Washington waters on the 303(b) list and the permits' authorization of some levels of pollutant discharge into those waters without making that discharge a permit violation is arbitrary and capricious. We conclude that it is not.

The permits are the result of a multi-decade iterative process. They are hundreds of pages long, the result of detailed back and forth with the community through the comment process, and have been the subject of years of litigation,

much of it involving Soundkeeper itself. Ecology has devoted a great deal of attention to the question of how to permit MS4s, and is sensitive to the many practical limitations on their operators' abilities to address the pollutants they discharge. To bring Washington's waters in ever greater compliance with water quality standards, they have crafted an iterative permitting system that seeks to impose ever greater requirements on permittees. The permits are therefore an attempt to—albeit more slowly than Soundkeeper and many others may wish—make sustained progress in improving our state's water quality.

But a permit system that aims for incremental improvement is not willful and unreasoning and taken without regard to the attending facts or circumstances, especially when it comes to application of standards concerned with what is "reasonable" (AKART) and "practicable" (MEP). These words, after all, leave ample room for discretionary decision-making. Instead, this system of iterative permits is an attempt to take the many facts and circumstances that attend MS4s into account and craft a structure that accomplishes sustained progress in the face of great complexity.[23]

Nor has Soundkeeper demonstrated that Ecology's use or enforcement of the permits is arbitrary and capricious, or in some way reflects back on the permit conditions to render them impermissible. Soundkeeper relies heavily on the fact that Ecology has seldom used S4 to impose requirements above those already

---

[23] The parties debate whether, in analyzing the permits' compliance with applicable standards, we should look only at Section S4, or to the permits more broadly. It is a distinction without a difference. Section S4.F incorporates the whole of the permits by allowing Ecology to consider whether a site-specific violation will be remediated through the application of any existing measures.

imposed by S5. Characterizing this as a lackadaisical approach and contrasting it with the increasing presence of certain streams on the 303(d) list, it contends that Ecology's failure to take advantage of S4 to impose stricter requirements is an indication of S4's insufficiency. But Soundkeeper admits that it is not, procedurally, challenging whether specific enforcement actions are arbitrary or capricious. if it were, without thorough review of the reasons for Ecology's reluctance to take advantage of Section S4 to impose stricter requirements, we could not conclude that Section S4's enforcement is somehow infirm.

We affirm.

Smith, C.J.

WE CONCUR:

Hazelrigg, A.C.J.          Mann, J.

40