**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| WEYERHAEUSER NR COMPANY,<br><br>Appellant,<br><br>v.<br><br>WASHINGTON STATE DEPARTMENT OF ECOLOGY and POLLUTION CONTROL HEARINGS BOARD,<br><br>Respondents,<br><br>and<br><br>NIPPON DYNAWAVE PACKING CO., LLC, and NORTH PACIFIC PAPER CO., LLC,<br>Intervenor-Respondents. | No. 86114-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — Weyerhaeuser NR Company (Weyerhaeuser), Nippon Dynawave Packing Co. (NDP), and North Pacific Paper Co., LLC (NORPAC), occupy a large industrial complex in Longview, Washington (Longview facility). Washington State Department of Ecology (Ecology) regulates stormwater discharges from the Longview facility under individual National Pollutant Discharge Elimination System (NPDES) permits issued most recently in 2019 to Weyerhaeuser, NDP, and NORPAC. Weyerhaeuser appealed the three NPDES permits and a penalty assessment to the

Pollution Control Hearings Board (PCHB). The PCHB granted summary judgment for Ecology on several legal issues. On appeal to this court, Weyerhaeuser argues the PCHB erred by (1) determining the Weyerhaeuser permit to be valid; (2) determining the NDP permit and the NORPAC permit did not violate 40 C.F.R. § 122.44(d)(1); (3) determining the NORPAC permit contained adequate monitoring requirements; and (4) affirming the penalty to Weyerhaeuser. We affirm the PCHB's orders on summary judgment on issues 1, 2, 5, 7, 8, 10, and 13.

I

The Federal Water Pollution Control Act, also known as the Clean Water Act (CWA), 33 U.S.C. §§ 1251-1389, is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA set a national goal to eliminate the discharge of pollutants into the Nation's waters by 1985. 33 U.S.C. § 1251(a)(1). The CWA also recognized the role of the States in controlling water pollution: "It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." 33 U.S.C. § 1251(b). Consistent with this policy, the CWA explicitly authorizes states to regulate water pollution more stringently than required by the CWA. 33 U.S.C. § 1370.

The CWA prohibits the discharge of any pollutant from a point source to navigable waters without a permit. 33 U.S.C. §§ 1311(a), 1362(12). The National Pollutant Discharge Elimination System (NPDES) is the permitting program through which individuals, corporations, and governments obtain the required permits. 33 U.S.C. § 1342; Decker v. Nw. Env't Def. Ctr., 568 U.S. 597, 602, 133 S. Ct. 1326, 185

L. Ed. 2d 477 (2013).  The Environmental Protection Agency (EPA) sets the base requirements for the NPDES program but is authorized to delegate the administration of the NPDES program to states if a state requests authority and is able to demonstrate adequate authority to implement the minimum requirements of the CWA.  33 U.S.C. § 1342(b).  In 1974, the EPA authorized Ecology to administer the NPDES program in Washington.  See Discharges of Pollutants to Navigable Waters, 39 Fed. Reg. 26,061 (July 16, 1974); RCW 90.48.260.  And in 1987, Congress passed the Water Quality Act, amending the CWA, so that stormwater discharges associated with industrial activity are subject to permit requirements.  Defs. of Wildlife v. Browner, 191 F.3d 1159, 1163, 197 F.3d 1035 (9th Cir. 1999); 33 U.S.C. § 1342(p)(2); Water Quality Act of 1987, Pub. L. No. 100-4, 101 Stat. 7.

"An individual permit authorizes a specific entity to discharge a pollutant in a specific place and is issued after an informal agency adjudication process."  Nat. Res. Def. Council v. U.S. Env't Prot. Agency, 279 F.3d 1180, 1183 (9th Cir. 2002).  The permit must include (1) effluent limitations that reflect the pollution reduction achievable by using technological controls and (2) any more stringent limits necessary to meet water quality standards.  Am. Paper Inst., Inc. v. U.S. Env'tl Prot. Agency, 996 F.2d 346, 349 (1993); 33 U.S.C. § 1311(b)(1)(A), (C); WAC 173-220-130(1).  Generally, water quality standards are based in part on two types of criteria: "specific numeric limitations on the concentration of a specific pollutant in the water (e.g., no more than .05 milligrams of chromium per liter) or more general narrative statements applicable to a wide set of pollutants (e.g., no toxic pollutants in toxic amounts)."  Am. Paper Inst., 996 F.2d at 349; 40 C.F.R. § 122.44.  Accordingly, NPDES permits may include both

narrative and numeric effluent limits. If numeric effluent limits are infeasible, narrative limits in the form of best management practices (BMPs) are used to control pollutants. 40 C.F.R. § 122.44(k).

Ecology also administers Washington's Water Pollution Control Act (WPCA), ch. 90.48 RCW. The WPCA prohibits the discharge of pollutants into any waters of the state. RCW 90.48.080. To that end, Washington NPDES permits require application of all known, available, and reasonable methods of treatment (AKART) regardless of the quality of the receiving water and the minimum water quality standards set for that water. WAC 173-220-130(1); RCW 90.52.040; 90.54.020(3)(b); 90.48.520.

A NPDES permit may be renewed every five years at which time Ecology may revise permit conditions as necessary for compliance and based on information provided by the discharger. WAC 173-220-180. Once a permit is issued, if Ecology determines that discharge causes or contributes to a violation of water quality standards, the permit must be modified. WAC 173-201A-510(1)(b).

Under this framework, Ecology regulates stormwater discharges from Weyerhaeuser, NDP, and NORPAC under three individual NPDES permits.

II

A

NDP, NORPAC, and Weyerhaeuser occupy the Longview facility. The Longview facility includes a Kraft pulp and paper mill, a thermo-mechanical pulp, de-ink, and newsprint paper mill, various inorganic chemical manufacturers, and a short-line railway. Weyerhaeuser's operations include a log sorting and export facility, a dimensional lumber sawmill, and a truck washing and maintenance facility. Historically,

the entire facility was owned and operated solely by Weyerhaeuser and stormwater discharges were allowed under a single NPDES permit that was last issued to Weyerhaeuser in 2014. At that time, Ecology performed a reasonable potential analysis to determine water quality based effluent limits (WQBELs) necessary to achieve water quality standards.

In 2016, Weyerhaeuser sold portions of the facility to NDP and NORPAC. Discharges from the three companies continued to be regulated under one NPDES permit which was transferred to NDP.

Stormwater from the Longview facility drains to either an industrial wastewater treatment facility owned and operated by NDP, or into one of two stormwater outfalls on Weyerhaeuser's property known as 003B and 004B. Weyerhaeuser has been required to monitor discharges from outfalls 003B and 004B since at least 1991. Stormwater that drains to outfalls 003B and 004B receives treatment before being discharged to the Consolidated Diking Improvement District (CDID) Ditch #3 which flows to the Columbia River. CDID Ditch #3 and the Columbia River are waters of the state and are listed as impaired and threatened waters.[1]

Outfalls 003B and 004B drain a large area of the complex and, unlike typical stormwater discharges, have flow year-round. The drainage area for outfall 003B includes Weyerhaeuser's log sort yard and export dock and NDP's chip storage piles. The drainage area for 004B includes NDP's administrative building, parking lot, and hog

---

[1] CDID Ditch #3 is water quality impaired for dissolved oxygen and is a water of concern for turbidity. Columbia River is water quality impaired for bacteria and temperature.

fuel storage, the majority of NORPAC's operations, and most of Weyerhaeuser's lumber operations.

While the Longview facility was still owned and operated solely by Weyerhaeuser, Weyerhaeuser was required to study its stormwater system, including areas later sold to NDP and NORPAC. The purpose of the study was to determine whether discharges from outfalls 003B and 004B were meeting effluent limits and the application of AKART. The study resulted in Weyerhaeuser's May 2016 AKART report which was approved by Ecology (the AKART report). The AKART report concluded that the outfall 004B drainage basin generally met performance limits while outfall 003B was more challenging to assess and that implementation of BMPs would support application of AKART.

Ecology issued a new NPDES permit to Weyerhaeuser effective August 1, 2019 (2019 Weyerhaeuser permit). The 2019 Weyerhaeuser permit authorized NDP and NORPAC to discharge stormwater into Weyerhaeuser's stormwater system. Ecology considered the NDP and NORPAC stormwater discharges to be internal discharges to Weyerhaeuser's stormwater system—not to waters of the state. Weyerhaeuser was also required to complete a receiving water study to determine whether discharges from outfalls 003B and 004B had a reasonable potential to cause a violation of water quality standards in CDID Ditch #3. After the study, Ecology would modify effluent limits as necessary.[2]

---

[2] The study was completed in June 2022.

In developing the 2019 Weyerhaeuser permit, Ecology considered data submitted by Weyerhaeuser under previous permits, the AKART report, and information submitted in permit applications. Ecology also conducted a reasonable potential analysis to determine WQBELs for discharge from outfalls 003B and 004B. Ecology evaluated numeric criteria for dissolved oxygen, fecal coliform, turbidity, toxic pollutants, and temperature. Ecology expected a potential for Weyerhaeuser to violate turbidity criteria but did not make a final determination pending completion of the receiving water study. Because of the limited data available for CDID Ditch #3, Ecology was unable to model the impact of the 5-day biochemical oxygen demand ($BOD_5$) and imposed performance based limits to meet AKART. Accordingly, the 2019 Weyerhaeuser permit authorized stormwater discharge to CDID Ditch #3 subject to numerical effluent limits for $BOD_5$, settleable solids, oil and grease, turbidity, copper, dissolved oxygen, and pH. The permit also required Weyerhaeuser to implement the AKART report and a stormwater pollution prevention plan (SWPPP).[3]

Ecology also issued a NPDES permit to NORPAC effective August 1, 2019 (2019 NORPAC permit). Ecology considered data submitted by Weyerhaeuser under previous permits, the AKART report, and information submitted in permit applications. Ecology expected NORPAC's stormwater discharges to comprise one-quarter to one-third of the total flow from outfall 004B and that, if NORPAC maintained its facility in

---

[3] A SWPPP includes BMPs. Under federal regulations, BMPs are defined as "schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of 'waters of the United States.' BMPs also include treatment requirements, operating procedures, and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage." 40 C.F.R. § 122.2. Washington defines BMPs as "physical, structural, and/or managerial practices approved by the department that, when used singularly or in combination, prevent or reduce pollutant discharges." WAC 173-201A-020.

accordance with historic practices, its discharges would not have a significant impact on Weyerhaeuser's system. Accordingly, the effluent limits for Weyerhaeuser's outfall 004B were reflected in the 2019 NORPAC permit as effluent benchmarks applied to outfalls 002A and 003A.[4] The 2019 NORPAC permit also contained narrative limits for all stormwater discharge to Weyerhaeuser's system. And the 2019 NORPAC permit contained BMPs and implementation of a SWPPP to prevent adverse impacts to Weyerhaeuser's stormwater system.

The NDP permit was modified in July 2019 (2019 NDP Permit) to remove the discharges associated with Weyerhaeuser and NORPAC and to authorize NDP to discharge stormwater to Weyerhaeuser's stormwater system. Ecology determined that stormwater discharges from NDP were minimal in comparison to Weyerhaeuser and NORPAC. The 2019 NDP permit was modified to include narrative limits for stormwater discharged to Weyerhaeuser's system, BMPs, and implementation of a spill control plan and SWPPP.

Both the 2019 NDP permit and the 2019 NORPAC permit required the permittees to notify Weyerhaeuser of conditions that could impact Weyerhaeuser's stormwater system.

B

On August 16, 2019, Weyerhaeuser appealed the three 2019 NPDES permits to the PCHB. The parties agreed to stay the proceedings while they engaged in negotiation to resolve the issues. The stay was lifted in February 2022.

---

[4] Effluent benchmarks are not numerical limits and discharges that fail to meet benchmarks are not automatically violations of the permit.

Meanwhile, in 2020, Ecology issued an administrative order to NDP, NORPAC, and Weyerhaeuser. The order cited Weyerhaeuser for 26 discharge violations for turbidity and $BOD_5$ at outfall 004B. Ecology also cited NORPAC for 37 benchmark exceedances of $BOD_5$, turbidity, pH, and settleable solids at outfalls that drain to Weyerhaeuser's system and then to 004B. Minor discharges from NORPAC also showed benchmark values for turbidity and $BOD_5$ that were above the daily maximum. Ecology determined that "industrial activities at [NPD, NORPAC, and Weyerhaeuser] have the potential to cause increased $BOD_5$ and turbidity levels" from outfalls 003B and 004B.

The parties were ordered to submit a stormwater system evaluation and characterization study sampling plan. The study revealed that there were more stormwater catch basins that could potentially receive contaminated stormwater from NDP's hog fuel prep area—which drains to outfall 004B—than previously reported.

On July 8, 2021, Ecology sent a notice of violation to Weyerhaeuser citing 3 violations at outfall 003B for pH, and 23 violations at outfall 004B for $BOD_5$ and turbidity. On February 14, 2022, Ecology issued a $40,000 penalty to Weyerhaeuser. Weyerhaeuser appealed Ecology's notice of penalty and the penalty appeal was consolidated with the 2019 permit appeal.

On March 8, 2022, the PCHB granted the intervention of NDP and NORPAC.

The parties submitted and agreed to the following legal issues relevant here:[5]

1. Does [the 2019 Weyerhaeuser Permit] arbitrarily and unlawfully impose liability upon Weyerhaeuser for stormwater discharges into Consolidated Diking Improvement District Ditch #3 ("Ditch #3") from Outfalls 003B and

---

[5] The parties originally agreed to 15 issues. Only the following seven are at issue in this appeal.

004B where such discharges are commingled with permitted and unpermitted discharges from [NDP] and [NORPAC]?

2. Does the [2019] Weyerhaeuser Permit arbitrarily and unlawfully impose upon Weyerhaeuser strict numerical effluent limits and monitoring requirements for storm water discharges into Ditch # 3 from Outfalls 003B and 004B where such discharges are commingled with permitted and unpermitted discharges from NDP and NORPAC that have no numerical effluent limits and are subject to less stringent monitoring requirements?

5. Does [the 2019 NDP Permit] violate 40 C.F.R. §122.44(d)(1) because it was issued without Ecology first undertaking a reasonable potential analysis?

7. Does [the 2019 NORPAC Permit] violate 40 C.F.R. §122.44(d)(1) because it was issued without Ecology first undertaking a reasonable potential analysis?

8. Does the [2019] NORPAC Permit violate the Clean Water Act because it lacks adequate monitoring requirements to ensure that NORPAC does not cause or contribute to violation of water quality standards in Ditch #3?

10. Should the permits be remanded for modification and reissuance by Ecology in accordance with the Clean Water Act, Administrative Procedure Act, and other laws, pursuant to WAC 371-08-540?

13. Should the Penalty assessed against Weyerhaeuser be dismissed because Weyerhaeuser's NPDES permit is invalid?

After considering motions and cross-motions, the PCHB granted summary judgment against Weyerhaeuser on these seven issues. Weyerhaeuser appeals.

III

The Administrative Procedure Act (APA), ch. 34.05 RCW, governs review of PCHB orders. Port of Seattle v. Pollution Control Hr'gs Bd., 151 Wn.2d 568, 587, 90 P.3d 659 (2004). If the agency decision was on summary judgment, "the reviewing court must overlay the APA standard of review with the summary judgment standard." Verizon Nw., Inc. v. Emp't Sec. Dep't, 164 Wn.2d 909, 916, 194 P.3d 255 (2008).

Accordingly, facts in the record are reviewed de novo and are viewed in the light most favorable to the nonmoving party. Verizon, 164 Wn.2d at 916. Summary judgment is appropriate only where the undisputed material facts entitle the moving party to judgment as a matter of law. Verizon, 164 Wn.2d at 916. "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a).

"Review is confined to the record before the Board." Snohomish County v. Pollution Control Hr'gs Bd., 187 Wn.2d 346, 357, 386 P.3d 1064 (2016). An agency's legal determinations are reviewed under the "error of law" standard, which allows this court to substitute its view of the law for the agency's. Puget Soundkeeper All. v. Pollution Control Hr'gs Bd., 189 Wn. App. 127, 136, 356 P.3d 753 (2015). Under this standard, questions of law and the agency's application of the law are reviewed de novo. Port of Seattle, 151 Wn.2d at 588.

Relief may be granted based on any of the grounds listed in RCW 34.05.570. Relevant here, this court shall grant relief if it determines that: (1) the PCHB has erroneously interpreted or applied the law or (2) the order is arbitrary and capricious, RCW 34.05.570(3)(d), (i). "An agency action is arbitrary or capricious if it 'is willful and unreasoning and taken without regard to the attending facts or circumstances.'" Honeywell v. Dep't of Ecology, 2 Wn. App. 2d 601, 611, 413 P.3d 41 (2017) (internal quotation marks omitted) (quoting Port of Seattle, 151 Wn.2d at 589).

A

Weyerhaeuser argues that remand of all three permits is necessary because the "permitting scheme" fails to ensure compliance with water quality standards. First,

Weyerhaeuser asserts the permitting scheme is unlawful because Ecology imposed no limits on discharge from NDP and less restrictive limits on discharge from NORPAC. In contrast, Ecology argues that it is not the scheme that must be sufficient, but rather each individual permit, and that Weyerhaeuser alone is responsible for compliance with its permit. We agree with Ecology.

Washington requires the application of AKART and any more stringent limits necessary to meet water quality standards. Effluent limitation means "any restriction established by the state or [EPA] on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into surface waters of the state." WAC 173-220-030. For stormwater discharges, the primary means to be used for requiring compliance with water quality standards is through BMPs. WAC 173-201A-510(3)(d). If a violation of water quality standards occurs when BMPs are being applied, the discharger must modify existing practices or apply further water pollution control measures that are selected or approved by Ecology to achieve compliance. WAC 173-201A-510(3)(b). Additionally, if Ecology determines a facility has substantial potential to violate water quality standards, Ecology will notify the facility and issue an order it deems appropriate. RCW 90.48.120.

Here, Ecology determined the effluent limits necessary in the 2019 Weyerhaeuser permit based on a reasonable potential analysis, data provided by Weyerhaeuser, and the AKART report. Ecology issued the 2019 NDP permit and 2019 NORPAC permit to include effluent limits and benchmarks based on classification of the discharges as internal, the amount of stormwater discharged by each company, the AKART report, information submitted with the permit applications, and the reasonable

potential analysis of discharge from outfalls 003B and 004B. In other words, Ecology considered the circumstances—the stormwater system as a whole—when developing the individual permits. Contrary to Weyerhaeuser's assertion, the 2019 NDP permit and 2019 NORPAC permit do contain effluent limits. And Weyerhaeuser provides no authority to persuade that the data considered by Ecology was somehow deficient or that the individual permits must be modified as a scheme.

Second, Weyerhaeuser argues that Ecology arbitrarily imposed effluent limits without providing Weyerhaeuser the tools to ensure it can address discharges from NDP and NORPAC. Weyerhaeuser provides a list of several mechanisms Ecology could have used when drafting the permit and asserts it is arbitrary and capricious for Weyerhaeuser to be solely responsible for ensuring compliance with its permit without such mechanisms. We disagree.

Weyerhaeuser provides no authority to support that Ecology was required to include any of the mechanisms listed. Instead, Ecology did what it was required to do and set certain permit conditions, including effluent limits it deemed necessary, to ensure compliance with water quality standards set for CDID Ditch #3. Weyerhaeuser was required to comply with the permit, apply AKART and BMPs to treat stormwater, and to modify treatment if violations were occurring. And Weyerhaeuser provides no argument or authority to persuade that the terms of its permit, the limits applied to outfalls 003B and 004B, are invalid.

Weyerhaeuser also points to Ecology's acknowledgment that the exceedances at NDP and NORPAC coincide with violations at outfall 004B and that industrial activities at all three companies contribute to discharge violations at outfall 004B. Weyerhaeuser

asserts that Ecology failed to account for changed circumstances when it issued the permits. We disagree.

Ecology's acknowledgment does not make Weyerhaeuser's permit invalid. As discussed above, Ecology developed the permits using several sources of information and considered the stormwater system as a whole. This included the change in circumstances resulting from NDP and NORPAC acquiring portions of the Longview facility. For example, Ecology required NORPAC to monitor outfalls that had been previously unmonitored. Ecology used information available at the time to develop the permits. Discovery of new information after permit issuance, such as previously unknown catch basins or the demolition of a building in a drainage area, does not render a permit invalid. The record shows Ecology did what it was supposed to do when it determined that the industrial activities of all three companies had the potential to cause violations of water quality standards—issue an order to address the exceedances and the substantial potential to violate.

Additionally, Weyerhaeuser cites language from the Phase II Municipal Stormwater Permit[6] as an example of requiring interconnected systems covered by a general permit to clarify roles and responsibilities among the systems. But the language does little to support Weyerhaeuser's argument. Municipal systems are not a good example because such systems are subject to different standards than those applied to the individual industrial NPDES permits at issue. See 33 U.S.C. § 1342(p); Defs. of

_____

[6] See Wash. Dep't of Ecology, Western Washington Phase II Municipal Stormwater Permit §§ S5.A.5, S5.C.5 (2019).

Wildlife, 191 F.3d at 1164. And, here, the individual permits at issue do clarify the roles and responsibilities of the parties as to their respective stormwater discharges.

Weyerhaeuser fails to show that the PCHB acted arbitrarily or erroneously. We affirm the PCHB's summary judgment order on issues 1, 2, and 10.

B

Weyerhaeuser asserts the PCHB erred by determining that the 2019 NDP permit and 2019 NORPAC permit did not violate 40 C.F.R. § 122.44(d)(1). Weyerhaeuser contends that Ecology was required to conduct a reasonable potential analysis of discharges from NDP and NORPAC and failed to do so. In contrast, Ecology argues the PCHB's decision was not erroneous because a site-wide analysis had been completed prior to modification of the 2019 NDP permit and the issuance of the 2019 NORPAC permit. We agree with Ecology.

A NPDES permit must contain any requirements in addition to or more stringent than promulgated effluent limitations that are necessary to achieve water quality standards. 40 C.F.R. § 122.44(d)(1); Wash. State Dairy Fed'n v. Dep't of Ecology, 18 Wn. App. 2d 259, 289-90, 490 P.3d 290 (2021). 40 C.F.R. § 122.44(d)(1) sets out the procedures that a permitting authority must follow to determine certain requirements necessary to achieve water quality standards. Subsection (d)(1)(i) first establishes that limitations must be set for pollutants that have the reasonable potential to violate water quality standards:

> (i) Limitations must control all pollutants or pollutant parameters (either conventional, nonconventional, or toxic pollutants) which the Director determines are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any

State water quality standard, including State narrative criteria for water quality.

Subsection (d)(1)(ii) then describes the process used to determine whether there is a reasonable potential for a discharge to lead to an instream violation of a water quality standard. This reasonable potential analysis process requires that:

> (ii). . . the permitting authority shall use procedures which account for existing controls on point and nonpoint sources of pollution, the variability of the pollutant or pollutant parameter in the effluent, the sensitivity of the species to toxicity testing (when evaluating whole effluent toxicity), and where appropriate, the dilution of the effluent in the receiving water.

Subsections (iii) through (v) then set out the requirement for the permit to include effluent limits for an individual pollutant where the reasonable potential analysis shows that the discharge may result in a violation of an ambient, numeric, or narrative water quality standards for an individual pollutant. 40 C.F.R. § 122.44(d)(1).

Under 40 C.F.R. § 122.44(d)(1), a reasonable potential analysis is required prior to setting pollutant-specific WQBELs. Nw. Pulp & Paper Ass'n v. Dep't of Ecology, 200 Wn.2d 666, 669, 520 P.3d 985 (2022); Wash. State Dairy Fed'n, 18 Wn. App. 2d at 289; City of San Francisco v. U.S. Env't Prot. Agency, 75 F.4th 1074, 1091, (9th Cir. 2023), cert. granted, 144 S. Ct. 2578 (2024). In City of San Francisco, the Ninth Circuit held that "section 122.44(d)(1) does not set forth an exclusive process for imposing WQBELs." 75 F.4th at 1092. In that case, San Francisco argued that general narrative prohibitions in their NPDES permit were unlawful because they were set without first

doing a reasonable potential analysis.  The Environmental Appeals Board[7] (EAB)

disagreed:

> Although 40 C.F.R. § 122.44(d) sets forth a process for deriving pollutant-specific effluent limits when the permitting authority determines that a particular pollutant has the reasonable potential to cause or contribute to an exceedance of water quality standards, the regulations do not require all permit conditions necessary to meet water quality standards to be expressed in terms of specific pollutant-by-pollutant limitations.

City of San Francisco, 75 F.4th at 1091.  The court agreed with the EAB and clarified:

> The regulations in this section set forth minimum requirements for imposing pollutant-specific WQBELs. It does not state that the permitting authority cannot set general narrative limitations limits to achieve compliance with [water quality standards]. The governing statutory section, 33 U.S.C. § 1311(b)(1)(C), requires EPA to impose limitations "necessary" to meet "water quality standards" without restricting the agency to the sort of pollutant-by-pollutant regulation contemplated in § 122.44(d)(1).

City of San Francisco, 75 F.4th at 1092.

Regulations also recognize that numeric limitations are not always feasible and

so WQBELs may be established by BMPs.  40 C.F.R. § 122.44(k); WAC 173-201A-

510(3); Wash. State Dairy Fed'n, 18 Wn. App. 2d at 289.  And, for stormwater

discharges, BMPs are the primary means to achieve compliance with water quality

standards.  WAC 173-201A-510(3)(d).

Weyerhaeuser argues the PCHB's decision was erroneous for three reasons.

First, Weyerhaeuser asserts that "unified system[s]" are not exempt from 40 C.F.R. §

122.44(d)(1).  But contrary to Weyerhaeuser's characterization, the permits at issue

---

[7] The EAB is an impartial tribunal established to hear administrative appeals under the major environmental statutes that the EPA administers.  See Changes to Regulations to Reflect the Role of the New Environmental Appeals Board in Agency Adjudications, 57 Fed. Reg. 5320 (Feb. 13, 1992)); see also 40 C.F.R. § 1.25(e)(2).

were not deemed exempt from the requirements of 40 C.F.R. § 122.44(d)(1). Ecology conducted a reasonable potential analysis for Weyerhaeuser's discharge from outfalls 003B and 004B to CDID Ditch #3 to determine pollutant specific WQBELs. The resulting numeric effluent limits imposed in the 2019 Weyerhaeuser permit were mirrored in the 2019 NORPAC permit as effluent benchmarks. A reasonable potential analysis was conducted for the NDP permit in 2014 and Weyerhaeuser does not persuade that further analysis was required when the permit was modified in 2019. And, as mentioned above, pollutant specific limits are not the exclusive means of compliance with water quality standards. Narrative limits and BMPs are WQBELs and were included in the 2019 NDP permit. Further, it is CDID Ditch #3 that is subject to water quality standards—not Weyerhaeuser's system—and it is undisputed that a reasonable potential analysis was done for discharges from outfalls 003B and 004B to CDID Ditch #3.

Second, Weyerhaeuser points to Ecology's recognition that the quality of discharge from outfall 004B changed since the AKART report was completed in 2016. But Ecology did not impose limits in the permits based solely on the AKART report. And Ecology did what it was supposed to do when exceedances occurred, issue an order with corrective actions based on its determination that industrial activity at the entire Longview facility had reasonable potential to cause increased $BOD_5$ and turbidity.

Third, Weyerhaeuser argues that the PCHB's reliance on the AKART report is erroneous. Weyerhaeuser points to the PCHB's decision on issue 9 that the AKART report did not contain information necessary to determine whether NORPAC's outfalls are substantially identical for monitoring purposes. But the fact that the AKART report

does not include certain information specific to NORPAC's outfalls does not make reliance on the report erroneous.  The purpose and focus of the AKART report was whether discharge from outfalls 003B and 004B were meeting requirements—not whether NORPAC's outfalls were substantially identical.  And discharges from operations now owned by NDP and NORPAC were included in the AKART report.  It is logical that such a report is relevant to the reasonable potential analysis for violations of water quality standards in CDID Ditch #3.  Weyerhaeuser fails to persuade that the PCHB erred by relying on the AKART report in deciding issues 5 and 7.

A reasonable potential analysis was done for the 2019 NDP permit in 2014.  And Ecology included effluent benchmarks in the 2019 NORPAC permit based, in part, on the AKART report and, in part, on the limits set at outfalls 003B and 004B that were determined by a reasonable potential analysis.  Weyerhaeuser does not establish that the PCHB acted arbitrarily or erroneously applied the law by determining that no further reasonable potential analysis was required under the circumstances.  We affirm the PCHB's summary judgment order on issues 5 and 7.[8]

C

Weyerhaeuser argues the PCHB acted arbitrarily when it decided that the 2019 NORPAC permit contains adequate monitoring requirements to ensure discharge does not cause or contribute to violation of water quality standards in CDID Ditch #3.  Weyerhaeuser points to the PCHB's finding that NORPAC's stormwater discharges

---

[8] Intervenor NDP argues that the appeal and argument related to the 2019 NDP permit is moot because the permit is expired and Ecology has issued a new permit; thus, this court cannot provide any effective relief.  Because the PCHB's decision regarding mootness is not before us, we do not reach the issue.

were known and characterized in the AKART report as inconsistent with its ruling that the AKART report failed to established adequate monitoring locations for NORPAC's operations.

Outfalls now classified as NORPAC outfalls 002A and 003A discharge into Weyerhaeuser's system and were not monitored under the previous permit. The majority of NORPAC's stormwater is discharged through 002A and 003A which flows through Weyerhaeuser outfall 004B. Under the 2019 NORPAC permit, outfalls 002A and 003A are subject to the same monitoring requirements as Weyerhaeuser's outfall 004B into CDID Ditch #3, except Weyerhaeuser must also monitor flow. Some of the stormwater from NORPAC discharges through smaller conveyance ditches or storm drains to Weyerhaeuser's outfall 004B. Ecology determined that the discharge at 002A and 003A was representative of all NORPAC's stormwater discharges based on similar industrial activities, BMPs, and stormwater runoff characteristics.

Regardless of the unmonitored locations in NORPAC's operations, the primary discharge by NORPAC is monitored, as is the ultimate discharge to CDID Ditch #3. NORPAC's discharge is not new and it was included in the AKART report. Further, the record shows that NORPAC's operations were consistent with practices in place at the time AKART was studied in 2016 and, since then, improvements were made as required by the 2019 NORPAC permit. The PCHB's reliance on the AKART report and finding that the discharges were known and characterized in the AKART report is not arbitrary.

Weyerhaeuser also argues that, even though NORPAC and Weyerhaeuser have nearly identical monitoring requirements, the Board ignores a key difference that the

-20-

2019 NORPAC permit allows minor unmonitored discharges. But it is not clear that such a difference is "key" considering the discharges are minor, the majority of discharge is monitored, and NORPAC is required to notify Weyerhaeuser of all discharges that could cause violations at stormwater outfalls. And Weyerhaeuser does not argue that Ecology acted arbitrarily or unlawfully when it decided that discharges from 003A and 004A were representative of all NORPAC's stormwater discharges.

Weyerhaeuser fails to show that the PCHB acted unreasonably or without regard to the attending circumstances when it decided that monitoring requirements in the 2019 NORPAC permit were adequate to ensure stormwater discharge did not cause or contribute to violations of water quality standards in CDID Ditch #3. We affirm the PCHB's summary judgment order on issue 8.

D

Lastly, Weyerhaeuser argues the penalty should be dismissed because it is arbitrary and unlawful for Ecology to impose a penalty for exceedances that may be caused or contributed to by NDP and NORPAC.

Because Weyerhaeuser agreed to dismiss issues 12 and 14 which asked whether the violations occurred and whether the penalty was reasonable, those issues are not before us. Thus, Weyerhaeuser's only argument is that the penalty should be dismissed because its permit is invalid. But Weyerhaeuser does not establish that its permit is invalid. We affirm the PCHB's ruling on issue 13.

In sum, the PCHB did not err by granting summary judgment in favor of Ecology on issues 1, 2, 5, 7, 8, 10, and 13. We affirm.

_Mann, J._

WE CONCUR:

_Chung, J._                    _Coburn, J._